# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                Case No.  21-CR-106-PP-SCD

SHAQUILE O. SLATER,

      Defendant.

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

The police, having been tipped off by a neighbor, suspected that Shaquile Slater was selling drugs from the Brown Deer residence he shared with family. After several months of investigation, Slater's probation agent issued an apprehension request for Slater to be taken into custody for suspected violations of the terms of his probation. About twenty law enforcement officers, including some armed with long guns, executed the apprehension request at Slater's residence a few weeks later. After arresting Slater and removing the other occupants from the home, the police conducted a probationary search of Slater's bedroom and found drugs and evidence of drug trafficking. The police then obtained permission from Slater's stepfather, the owner of the residence, to search the rest of the home. Inside the bedroom of Slater's adult sister, the police found two firearms, more drugs, and additional indicia of drug activity, all of which apparently belonged to Slater. Slater was subsequently indicted in federal court on drug-trafficking and firearms charges based on the evidence found during those searches.

Slater has moved to suppress all evidence seized from his residence, arguing that the police violated the Fourth Amendment when they searched his house without a warrant. Because the police reasonably suspected that Slater had committed a crime or violated a condition of probation, under Wisconsin state law the police could search Slater's bedroom without a warrant, and they did so in a reasonable manner. Moreover, because Slater has failed to demonstrate that he had a reasonable expectation of privacy in his adult sister's bedroom, he cannot challenge the search that led to the seizure of evidence from that room. I will therefore recommend that Slater's motion be denied *in toto*.

## BACKGROUND

The parties largely agree on the relevant facts, and neither has requested an evidentiary hearing. Thus, I take these facts from the parties' briefs, *see* ECF No. 24 at 1–12; ECF No. 28 at 1–8, and Slater's exhibits (available in hard copy). Apparently, these facts come from the discovery materials in this case, with one minor exception.

### I.  Investigation of Apparent Drug Activity at 8304 North 48th Street

In May 2020, a concerned citizen—let's call him "C.S.," as in "confidential source"—contacted the Brown Deer Police Department about suspected drug trafficking at a neighbor's residence: 8304 North 48th Street in Brown Deer, Wisconsin. C.S. told the police that a lot of vehicles visited the residence throughout the day and that the subjects in the vehicles entered the residence briefly before leaving a short time later. C.S. also told the police that sometimes when a vehicle arrived, a young, black male would exit the residence, enter the parked vehicle briefly, and then return to the residence. Other times, C.S. observed a subject arrive at the residence, exit his vehicle carrying a black garbage bag, enter the residence briefly, and then return to his vehicle carrying a blue pillowcase.

2

Based on the information provided by C.S., the police began investigating possible drug activity at the 48th Street residence. Timothy Benway, a Brown Deer police officer, learned that Shaquile Slater lived at that residence and that Slater was on probation for dealing marijuana. Slater's rules of supervision prohibited him from (among other things) engaging in violations of any law, possessing firearms or ammunition, possessing illegal drugs, and traveling outside of Wisconsin without approval. The rules also required Slater to make himself available for searches of his residence and personal property under his control.

Officer Benway located a Facebook profile for "Shaquile Slater." The individual depicted in that profile matched Slater's correctional photo, as well as an individual frequently seen on photos and videos captured by C.S. The profile contained photos of a man who appeared to be Slater holding large stacks of cash, including one where Slater posed on the hood of a gray Audi that appeared parked in the driveway of the 48th Street residence:

 

ECF No. 28 at 2. The profile also contained multiple posts referencing the sale of "ZaZa,"



3

which Officer Benway knew from his training and experience to be a street name for marijuana. *Id.*

Between May and August 2020, C.S. continued to provide information to the police, including video footage and photographs of suspected drug activity at the 48th Street residence. A video from May 28 depicts a man in a red shirt and red shorts exit the residence and exchange what appears to be a bag of marijuana for cash with the driver of a vehicle parked in front of the residence. Officer Benway shared the video with Jada Miller (Slater's probation agent), who confirmed that the man in the red outfit was Slater. A video from July 4 depicts a man believed to be Slater exit the residence and hand something to the driver of a vehicle parked in front of the house. A video from July 17 depicts a man who matches Slater's physical description exit the residence carrying what appears to be a long rifle, get into a vehicle parked outside the residence, and then return to the house after spending about twenty minutes inside the vehicle. Videos from August 6 and August 24 depict Slater interacting with a vehicle outside the residence, but according to Slater they do not show any transaction or exchange.

The police also conducted their own surveillance of the 48th Street residence. An officer reported that, on June 25, 2020, he observed a group of individuals arrive at the residence, approach the home, and then enter for a short while before leaving. The officer also reported observing Slater and one of the individuals exchange money for a bag containing a white powdery substance, though Slater claims surveillance photos of that encounter do not support the officer's observations.

Five times between June and August 2020, the police searched the trash left at the curb of the 48th Street residence. During one search on July 10, the police found the cover to a

digital scale, a broken cell phone, and several plastic baggies with corners tied. The police, however, did not locate any suspected contraband during the other searches.

C.S. also provided the police with a list of license plate numbers and descriptions of vehicles observed at the 48th Street residence. The police learned that some of those vehicles were registered to owners who had prior criminal drug history. However, discovery does not reveal any record of the police attempting to stop any of those vehicles leaving the residence. Likewise, discovery does not reveal any controlled buys from Slater or any attempts to track his whereabouts or monitor his phone activity.

## II.    Traffic Incident and Apprehension Request

At 1:57 a.m. on August 25, 2020, Illinois police attempted to stop a gray Audi that was driving northbound toward Wisconsin at speeds exceeding 100 miles per hour. After the driver of the Audi did not pull over, the state trooper initially started to pursue it, but he stopped because the Audi was traveling too fast. Approximately thirty minutes later, Wisconsin police observed a gray Audi enter the state driving at a high rate of speech. The Wisconsin state trooper was able to catch the license plate number on the Audi, which he discovered was registered to Sheila King at the 48th Street residence. It appears the Wisconsin state trooper shared this information with Illinois police, who asked for assistance from the Brown Deer Police Department. At approximately 3:15 a.m., Brown Deer police officers went to the 48th Street residence to talk to King, who is Slater's mother. King told the police that Slater had left the residence in her gray Audi at about 9:00 p.m. and that he hadn't returned home. Officers confirmed that the Audi was not in the garage and then left.

The following day, Officer Benway told Slater's probation agent about the incident involving the Audi. Officer Benway explained that Slater had fled from Illinois police in his

mother's gray Audi.[1] He further explained that King had told officers that Slater had left the residence in the Audi hours before the vehicle was observed speeding and fleeing the police in Illinois. Officer Benway followed up with Miller the next day. He told Miller that the Illinois police had surveillance footage of the Audi, but they were not able to identify the driver due to the vehicle's high rate of speed and dark window tint.

On September 1, 2020, Miller issued an apprehension request for law enforcement to take Slater into custody. The apprehension request was based on several alleged violations of Slater's probation. First, Miller was aware that since May 2020 the police had been investigating Slater for possible drug trafficking at his residence. Second, Miller knew that Slater had been arrested and cited in Illinois for aggravated speeding and driving with a suspended license on July 28, 2020, at approximately 2:04 a.m. Third, Miller considered the incident involving the Audi on August 25, which also was a suspected violation of Slater's travel restrictions. After Miller issued the apprehension request, Slater missed his scheduled contacts with her on September 2 and September 8, 2020.

## III. Execution of the Apprehension Request

On September 15, 2020, an investigate team went to the 48th Street residence to execute the apprehension request and arrest Slater. Prior to their arrival, Officer Benway contacted C.S., who confirmed that Slater was inside the residence. The investigative team consisted of nearly twenty law enforcement officers, including Brown Deer police officers and members of a U.S. Marshals task force. Each task force officer wore military-style fatigues,

---

[1] This is the one exception referenced earlier about information obtained outside the discovery materials; Slater claims that he obtained this information directly from Miller.

with helmets, vests, and shields. Some also carried long guns, which they aimed at the residence.

The 48th Street residence is a modest, three-bedroom, single-family home. The three bedrooms are located upstairs. Slater occupies one of the rooms; King and her husband, David Yursky, occupy another; and Slater's adult sister, Christina Flores, stays in the third room with her minor daughter. Yursky owns the home.

The investigative team arrived at the residence around 9:06 a.m., knocked on the front door, and announced that the police were there with a warrant for Slater. Officers observed a woman, later identified as Flores, approach the door and run when she saw the police. Moments later, officers heard a woman inside the residence yell, "The police are here!" Officers continued to knock and announce their presence. They also warned that the door would be breached if someone didn't let them in. No one answered, so officers broke down the front door and entered the residence. Video footage from Officer Benway's body-worn camera shows that officers had been knocking for about ninety seconds before they decided to breach the door at around 9:08 a.m. *See* Exhibit 1 at 0:00:00–0:01:35.[2]

After breaking down the front door, the investigative team instructed the occupants to exit the residence. Flores and her daughter exited first, with Flores telling officers that Slater was inside. Officers cleared the main level of the home before heading upstairs to two closed bedrooms. They located Slater and his girlfriend in one of the bedrooms. Slater initially identified himself as his brother, Sedrick. However, moments later, he admitted his real identity. Officers arrested Slater, handcuffed him, and placed him in the back of a police squad; he was removed from the house by 9:10 a.m. *See* Exhibit 1 at 0:03:58. At the time of

---

[2] References are to the timestamps on the bottom of the videos.

his arrest, Slater had on him two cell phones, a set of keys to the gray Audi, and $310 in cash. Officers also escorted the girlfriend outside, where she waited with Flores, Flores' daughter, and a young male (believed to be Slater's nephew). Officers located Yursky in the other bedroom. He was placed in handcuffs too and escorted outside by 9:12 a.m. *See* Exhibit 1 at 0:06:06.

As officers were checking the residence to make sure no other people were inside, Slater's mother pulled into the driveway. She asked the police what was going on; Officer Benway responded, "We have a warrant for the house." Exhibit 1 at 0:04:00–0:04:08. When King asked to see the warrant, Benway told her to get out of her car, and she did. *See* Exhibit 1 at 0:04:08–0:04:43. A few minutes later, Benway asked King if Sedrick was home; she responded, "No," and explained that Sedrick stayed there "off and on." Exhibit 1 at 0:07:27–0:07:36. At about 9:15 a.m., an officer asked Benway if the other officers were still inside the residence searching; Benway responded, "Yeah, they're searching the rest of the house. So we have Shaquile. I think they're still looking for Sedrick." Exhibit 1 at 0:09:06–0:09:15.

While clearing the residence, officers found two firearms in Flores' bedroom. In his report, Officer Benway had this to say about the discovery of the firearms:

> I was also informed by Agent Leannais that while clearing the residence for persons inside, the USMS team located two firearms, an AR-15 rifle and a black handgun, hidden behind an armoir in the furthest southeast bedroom of the residence.

Exhibit 2.[3] Investigators later photographed the armoire and the firearms:

---

[3] Despite the large presence of law enforcement personnel at the scene, Officer Benway apparently is the only one who wrote a report about the events on September 15, 2020. However, Officer Benway remained outside during the initial entry into or search of the 48th Street residence.

 

*See* ECF No. 24 at 7. The armoire had been flush against the wall before the officers' entry. As shown in the photos, officers moved the armoire to locate the guns. However, they did not seize the firearms at that time. It's unclear at what time officers first saw the guns.

Officers then searched Slater's bedroom. They found several identifiers for Slater, as well as a large digital scale; a manual for an adjustable laser sight for a firearm; another digital scale with suspected marijuana residue on it; at least sixteen retail packages of "Cheetah Piss" THC, each containing 3.3 grams of marijuana; two boxes of unopened sandwich bags; a container of rubber bands; a large Ziplock bag containing other empty bags with suspected marijuana residue inside; and $5000 in cash. There is no video evidence of officers clearing the residence, finding the firearms, or searching Slater's bedroom; those officers were not wearing body cameras or did not activate them. Thus, it's unclear exactly what went on inside the residence and whether the clearing and the search occurred simultaneously or sequentially. However, piecing together the video footage that is available, it appears officers

9

were inside the residence from 9:08 a.m. until at least 10:01 a.m. to clear the residence and search Slater's bedroom. *See* Exhibits 1, 3, 4.

While other officers were searching Slater's bedroom, Officer Benway explained to Slater what was happening. Benway told Slater that he had a felony warrant for a probation violation and that the officers were part of a task force that assisted in looking for and arresting people with felony warrants. Benway also indicated that Sedrick had "something out for him too." Slater asked why they were searching and "doing all that extra stuff" like breaking his door in; Benway responded, "It's just standard protocol. They just got to search through the entire house to make sure that it is completely empty." After Benway stated that the officers were still in there clearing the residence, Slater said, "It should be clear. Ain't nobody else in there." Benway said it was a big house and there were a lot of spots to look in to make sure it was empty. This conversation took place around 9:30 a.m. *See* Exhibit 1 at 0:23:58–0:25:08.

After Officer Benway walked away, at about 9:47 a.m., Slater indicated that it appeared officers were searching the house, not looking for people. Daniel Hanson, the Brown Deer police officer tasked with staying at Slater's side, explained that he didn't know what the search warrant allowed the officers to do. Slater was surprised to hear about a search warrant. Officer Hanson indicated he assumed there was a search warrant to enter "based on his training and experience of how this went down." *See* Exhibit 4 at 0:34:24–0:35:15.

Once the officers finished searching Slater's bedroom, Officer Benway asked Yursky, the owner of the residence, if the police could search the rest of the house. *See* Exhibit 3 at 0:23:18–0:23:24. Yursky was not handcuffed at the time and had been free to walk around the property since at least 9:46 a.m. (recall that officers finished searching Slater's room around 10:01 a.m.), though several officers remained nearby watching and one made sure to

10

follow Yursky when he walked around the house and into the garage. *See* Exhibit 4 at 0:03:35–0:22:25. Benway explained that there were "some things" that were found in the house that Yursky claimed he wasn't previously aware of. King, who was standing next to Yursky at the time, told police that they couldn't search the home, but Benway said it was up to Yursky. When Yursky indicated that he thought police had already searched the home, Benway explained that they had searched only Slater's room, which Benway claimed was allowed because Slater was on probation. King continued to object to the search saying, "My money is in there." Officers explained that they were after drugs and firearms, not King's money, so King said, "Ok, you cleared that up. Go ahead and do what you do." Yursky then signed a consent form, which indicated that "this written permission to search without a search warrant is given by me to the officer voluntarily and without any threats, coercion, or promises of any kind." *See* Exhibit 4 at 0:23:24–0:23:31.

During the search of the rest of the home, officers found more contraband in Flores' bedroom. Inside a laundry hamper was a silk bag containing a digital scale, empty sandwich bags, a knotted plastic bag containing 56.5 grams of marijuana, and another knotted plastic bag containing 17 amphetamine pills. Officers also seized the two firearms seen earlier behind the armoire: a loaded .223 caliber rifle (the AR-15) and a loaded .9mm semi-automatic pistol. Flores told police that she never owned a firearm and that there were no drugs in the hamper when she folded laundry that morning.

Officers also searched the gray Audi. Inside they found several identifiers for Slater and other small quantities of marijuana.

Law enforcement interviewed Slater a few days after his arrest. Slater acknowledged that the marijuana recovered from his bedroom was his for personal use, but he denied selling

11

drugs. At first he also denied knowing about the guns found under the armoire in Flores'
bedroom. However, Slater eventually admitted that he had handled the firearms and that he
had been asked by someone to hold onto them for a while. A lab report confirmed that Slater's
DNA was on the handgun; the DNA mixture on the rifle was not suitable for comparison.

## IV. Federal Charges

On May 18, 2021, a federal grand jury indicted Slater for unlawfully possessing the
two firearms found behind the armoire, possessing with intent to distribute marijuana, and
possessing the two firearms in furtherance of drug trafficking. *See* ECF No. 1. The matter is
assigned to U.S. District Judge Pamela Pepper for trial and to me for resolving pretrial
motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. At Slater's
request, Judge Pepper adjourned the trial date. *See* ECF No. 14. On August 18, 2021, Slater
filed a motion to suppress all evidence recovered from the 48th Street residence on September
15, 2020. *See* ECF No. 24. The United States filed a brief in opposition on September 7, 2021.
*See* ECF No. 28. On September 14, 2021, Slater filed a reply brief. *See* ECF No. 29. At my
request, *see* ECF No. 30, Slater filed a supplemental brief on October 1, 2021, *see* ECF No.
31, and the United States filed a supplemental brief on October 8, 2021, *see* ECF No. 32.

## DISCUSSION

Slater argues that the police violated the Fourth Amendment when they searched his
bedroom and the rest of the 48th Street residence without a warrant.

## I. Search of Slater's Bedroom

Slater contends that the search of his bedroom was unreasonable. He accuses the police
of circumventing the Fourth Amendment and using subterfuge to obtain the apprehension
request from Miller, his probation agent. Slater also maintains that any reasonable suspicion

that existed to search his bedroom had grown stale by the time of the search. And, even if there was reasonable suspicion, Slater claims that law enforcement conducted the search in an unreasonable manner.

## A.  The apprehension request comported with the Fourth Amendment

Slater first contends that the apprehension request was invalid because it was based on misinformation: Officer Benway reported to Miller as conclusive fact, rather than merely suspicion, that Slater was driving the gray Audi when it sped away from Illinois police on August 25, 2020.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. Accordingly, citizens generally "enjoy the right not to be seized or arrested absent probable cause." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). Individuals on probation and parole, however, "have a more limited liberty interest than ordinary citizens." *Id.* (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). In Wisconsin, a probation agent may issue an apprehension request for a probationer if she has "reasonable suspicion that the probationer violated a probation term." *Alston v. City of Madison*, 853 F.3d 901, 911 (7th Cir. 2017) (citing *Knox*, 342 F.3d at 657); *see also State v. Goodrum*, 449 N.W.2d 41, 44 (Wis. Ct. App. 1989) ("A probationer may be taken into custody and detained for an investigation of an alleged violation.") (citing Wis. Admin. Code HSS § 328.22(2) (July 1987)[4]). Nevertheless, like traditional warrants, an apprehension request "violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for

---

[4] Wisconsin repealed and recreated this administrative rule in 2013. *See State v. Lee*, No. 2012AP1042-CR, 2013 WL 5911454, 2013 Wisc. App. LEXIS 916, *6 n.3 (Nov. 5, 2013). A similar provision is now found in Wis. Admin. Code DOC § 328.27(2), which states that a probation agent may issue an apprehension request "for investigative, disciplinary, or prophylactic purposes." *Id.* at *6 (citing Wis. Admin. Code DOC § 328.22 (Dec. 2006)).

13

the truth, makes false statements in requesting the [apprehension request] and the false statements were necessary to the determination that [an apprehension request] should issue." *See Sundsmo v. Calkins*, No. 15-cv-2-jdp, 2016 WL 1058291, 2016 U.S. Dist. LEXIS 32646, *16–20 (W.D. Wis. Mar. 14, 2016) (likening an apprehension request to a traditional arrest warrant) (quoting *Knox*, 342 F.3d at 658).

Slater has failed to demonstrate that Miller relied on misinformation when she issued the apprehension request. A probation agent can rely on information from police in determining whether to issue such a request. *See Goodrum*, 449 N.W.2d at 45 (finding a probation agent "justified in relying on the information given to him by the sheriff's department" to issue a probation hold). Here, Miller relied in part on information provided by Officer Benway about Slater's suspected involvement in fleeing from Illinois police at a high rate of speed during the early morning hours of August 25, 2020. Slater has not shown that Benway provided false information or omitted critical facts when recounting the details of that incident. The only alleged misinformation concerns whether Slater was in fact driving the gray Audi when it fled from the police. But, according to the government, Benway told Miller that the Illinois state trooper was not able identify the driver because the Audi was traveling too fast and it had dark, tinted windows. Slater does not dispute these facts. Thus, the record before me shows that Benway did not claim as a conclusive fact that Slater was the driver of the Audi on August 25.

Moreover, Miller did not need to be certain that Slater was the driver of the Audi to issue the apprehension request. Apprehension requests need only be supported by reasonable suspicion. According to the Seventh Circuit, "reasonable suspicion is 'something less than probable cause but more than a hunch,' which exists when there is some 'objective

manifestation' that a person is, or is about to be, engaged in prohibited activity." *Knox*, 342 F.3d at 659 (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). Officer Benway told Miller that the police talked to King, Slater's mother and the registered owner of the Audi, just over an hour after Illinois police observed the Audi fleeing at a high rate of speed. King told police that Slater had left the house in the Audi hours prior and had not returned. Also, the police confirmed that the Audi was not at the residence at the time. These undisputed facts constitute an objective manifestation that Slater likely violated two terms of his probation: (1) that he not engage in any violations of law; and (2) that he obtain permission from Miller before leaving Wisconsin. In other words, Miller had much more than a hunch that Slater was driving the Audi when it fled from police in Illinois.

Even if Officer Benway did misrepresent what he knew about the incident involving the Audi on August 25, that information was not required for the apprehension request to issue because other, undisputed evidence supported Miller's reasonable suspicion that Slater violated the terms of his probation. According to the government, Miller also knew about the police's ongoing investigation into Slater's alleged drug activity at his residence. (More on this later.) And she knew that Slater had been arrested and cited in Illinois in July 2020 for aggravated speeding and driving with a suspended license. Thus, even without the incident on August 25, Miller possessed enough facts to order Slater into custody at least to investigate those other alleged violations. *See* Wis. Admin. Code DOC § 328.27(2)(a).

In sum, I find that the apprehension request issued by Slater's probation agent comported with the Fourth Amendment. Because the apprehension request was valid, the police were well within reason to execute it at Slater's home. *See State v. Smith*, No. 87-2011-

15

CR, 1988 Wisc. App. LEXIS 395, *13 (May 17, 1988) (rejecting defendant's argument that the police used a probation-hold order as subterfuge to arrest him).

**B.    The police had reasonable suspicion to search Slater's bedroom**

Slater next contends that the police lacked reasonable suspicion to search his bedroom. According to Slater, most of the information known to the police was too old to support the search on September 15, 2020: there were no reports of a suspected drug transaction at the 48th Street residence since early July, a man believed to be Slater was seen outside the residence with a rifle on July 17, the recent trash pulls did not reveal any evidence of drug activity, and the police did not report any recent social media activity suggestive of drug sales. Also, Slater maintains that the August 25 incident involving the Audi did not appear to have motivated the search, and, in any event, "[t]here was no reason to believe police might find evidence of that violation in [his] bedroom dresser." ECF No. 24 at 26.

"Fourth Amendment law has long recognized that criminal offenders on community supervision have significantly diminished expectations of privacy." *United States v. Caya*, 956 F.3d 498, 500 (7th Cir. 2020). As such, a law enforcement officer in Wisconsin may search certain individuals on probation, parole, or extended supervision without consent, a warrant, or probable cause. *See State v. Anderson*, 2019 WI 97, ¶¶ 2, 22, 935 N.W.2d 285 (citing 2013 Wisconsin Act 79 (colloquially referred to as "Act 79")). A probationer, like Slater, may have his person, his residence, and any property under his control "searched by a law enforcement officer at any time during his . . . period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation." Wis. Stat. § 973.09(1d). "In essence, this statute lowers the legal standard required for a law enforcement officer to perform a search of a suspect [from

probable cause to reasonable suspicion] if that suspect is on one of Act 79's specified supervision statuses." *Anderson*, 2019 WI 97, ¶ 23 (referencing Wis. Stat. § 302.113(7r), a companion provision for individuals on extended supervision)[5]; *see also United States v. Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.").

The Wisconsin Supreme Court recently explained the reasonable-suspicion standard as it related to the Act 79 search of an offender on extended supervision:

> Reasonable suspicion is a fairly low standard to meet. Although it is not possible to state precisely what the term reasonable suspicion means, it is a commonsense nontechnical conception . . . that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Such reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. A determination of reasonable suspicion is made based on the totality of the circumstances.

*Anderson*, 2019 WI 97, ¶ 33 (internal citations and quotation marks omitted). The standard is the same in federal court. *See, e.g.*, *Navarette v. California*, 572 U.S. 393, 396–97 (2014); *United States v. Chang*, 999 F.3d 1059, 1065–67 (7th Cir. 2021).

The totality of the circumstances here demonstrate that the police had reasonable suspicion to believe that Slater had committed, was committing, or was about to commit a crime. The police first learned about potential drug activity at the 48th Street residence in May 2020, when C.S. reported a high amount of vehicular traffic at the residence, brief interactions

---

[5] Slater cites to § 302.113(7r), *see* ECF No. 24 at 25, but the parties agree that he was on probation, not extended supervision, at the time of the search at issue here, *see id.* at 2; ECF No. 28 at 2. Save for language about probation or extended supervision, the statutes are identical. *See State v. Euell*, No. 2019AP277-CR, 2020 Wisc. App. LEXIS 114, *5 n.5 (Mar. 17, 2020) (noting that "a person on probation for a felony or for [distributing controlled substances] is treated, under Act 79, in the same manner as a person released on extended supervision").

between subjects in the vehicles and members of the residence, and a subject enter the residence carrying a black garbage bag and leave a short time later with a blue pillowcase. The police opened their own investigation and learned that Slater, who at the time was on probation for marijuana trafficking, lived at the residence. The police located a Facebook profile depicting a man who appeared to be Slater posing with large stacks of cash and advertising "ZaZa"—a slang term for marijuana—for sale. The Facebook photos provided to me are not timestamped; the post about ZaZa is dated April 8, but the year is unknown.

The investigation continued throughout the summer of 2020, as C.S. continued to provide information to the police, including videos and photos of suspected drug activity, and the police conducted an independent investigation. A video from May 28 depicted a man identified as Slater by his probation agent exchange what appeared to be a bag of marijuana for cash with the driver of a vehicle. On June 25, a police officer reported observing Slater exchange money for a bag containing a white powdery substance with an individual outside the residence. A video from July 4 depicted a man believed to be Slater engage in a hand-to-hand exchange with the driver of a vehicle parked in front of the house. A search of the residence's curbside trash on July 10 unveiled indicia of drug-trafficking activity, including the cover to a digital scale and several corner-cut plastic baggies. A video from July 17 depicted a man who matches Slater's physical description walk out of the residence carrying what appeared to be a rifle, get into a vehicle parked outside the residence, and return to the house after about twenty minutes. Videos from August 6 and 24 depict Slater interacting with a vehicle outside the residence. In addition to the visual surveillance, the police also knew that some of the people who briefly stopped by the residence had a prior criminal drug history. Together, these specific and articulable facts established reasonable suspicion that criminal

activity was afoot at the 48th Street residence and that Slater was personally involved in that activity.

Slater doesn't dispute that the totality of the circumstances added up to reasonable suspicion, arguing instead that the information was too dated by the time the police got around to searching his bedroom on September 15, 2020. I disagree. First, Slater overlooks the August 25 incident in Illinois in which he was believed to be fleeing police at a high rate of speed. It wasn't just that he had a broken taillight or committed a routine speeding infraction—he was fleeing police in an effort to evade capture. Individuals who flee police typically do so for a reason: they are likely to possess evidence of, or be involved in, illegal activity. If that's true, then his fleeing on August 25 bolsters the earlier evidence of his illegal drug-dealing activity. Put another way, fleeing police makes it more likely that he had continued drug-dealing activity at his home in late August and into September, when the arrest occurred.

Second, even putting that to one side, the only case Slater cites to support this argument, *United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010), is distinguishable from our case legally and factually. *Brooks* involved a search warrant that had to be supported by probable cause, *id.* at 492; here, the police needed only reasonable suspicion—a substantially lower level of suspicion—to search Slater's bedroom pursuant to Act 79. Also, the most recent information about possible drug activity in *Brooks* happened six months prior to the date of the search-warrant affidavit, *id.* at 493 n.4; here, the last potential criminal activity likely involving Slater occurred on July 10 (the incident involving the rifle), less than ten weeks before the search. Moreover, the passage of time is less important in our case given the evidence of "an on-going pattern of criminal activity" at Slater's residence from May to

19

August 2020. *United States v. Wiley*, 475 F.3d 908, 916 (7th Cir. 2007) (citing *United States v. Lamon*, 930 F.2d 1183, 1187–88 (7th Cir. 1991)). Put another way, there is no evidence to suggest that Slater stopped living at the 48th Street residence prior to the search or suddenly closed up shop on his apparent drug business. *See United States v. Glenn*, 966 F.3d 659, 660–61 (7th Cir. 2020) (rejecting argument that a month gap between a controlled buy and a residence search rendered a search warrant invalid because there was no evidence to believe that the house had been sold in the interim or that the defendant had changed his line of business). The police therefore reasonably inferred that evidence relating to illegal drug activity would still be found in Slater's bedroom at the time of the search.

In addition to the suspected criminal activity at the 48th Street residence, the totality of the circumstances also demonstrate that the police had reasonable suspicion to believe that Slater had committed multiple violations of his probation conditions. The above facts established reasonable suspicion to believe that Slater had violated three separate conditions: (1) that he not engage in violations of any law, (2) that he not possess firearms, and (3) that he not possess illegal drugs. But the police also knew about the incident involving the Audi on August 25 and likely knew about Slater's arrest and citation for driving infractions in Illinois on July 28. Thus, the police reasonably suspected that Slater had committed additional violations of law and had left the state without his probation agent's permission. Slater claims that evidence of those alleged violations was not likely to be found in his bedroom, but I disagree. For example, the police could have been looking for keys to the Audi to demonstrate Slater had access to and drove the vehicle or receipts or cell-phone activity showing that Slater was in fact in Illinois on those dates. A cell phone would likely reveal information about his location as well. These specific and articulable facts—that Slater likely violated his probation

20

conditions—established an independent (and more recent) ground for the Act 79 search of Slater's bedroom.

### C.    The police conducted the bedroom search in a reasonable manner

Even if the police had reasonable suspicion to search Slater's bedroom under Act 79, they still had to conduct that search "in a reasonable manner." Wis. Stat. § 973.09(1d). Slater contends that the bedroom search was unreasonable because the police misled Slater's probation agent into issuing the apprehension request, exploited the apprehension request to arrest Slater at his residence so they could conduct a warrantless search of the home, used excessive force to execute the apprehension request, and didn't adequately record or preserve body-cam videos of the events at Slater's residence on September 15, 2020. Slater maintains that the police had less intrusive means to effectuate the apprehension request. For instance, he suggests they could have arrested him during a traffic stop after he left the home, advised him of the apprehension request and asked him to turn himself in, or sent Miller (his probation agent) to the home with a couple of police officers. Instead, according to Slater, the police "chose the nuclear option" and proceeded "as if they were conducting a military raid against a terrorist cell in Fallujah." ECF No. 24 at 27–28.

Slater's arguments are not persuasive. First, I have already determined that Officer Benway did not mislead Miller into believing as a conclusive fact that Slater was driving the Audi when it sped away from Illinois police on August 25. Second, the police did not use the apprehension request as a stalking horse to circumvent the Fourth Amendment. Even without Miller's apprehension request, Act 79 still authorized law enforcement to search Slater, Slater's residence, and any property under Slater's control for the suspected violations of law and the conditions of his probation. The efficiency realized in executing the apprehension

21

request and the Act 79 search at the same time does not make that search unreasonable. Besides, Slater skipped his two appointments with Miller after she issued the apprehension request, so she was unable to inform him about the request or have him arrested during those appointments.

Third, given the circumstances, it was reasonable for Officer Benway and Miller to recruit the help of the Marshals task force in executing the apprehension request. The Seventh Circuit has recognized that "it is widely known that guns and drugs go hand in hand." *United States v. Gulley*, 722 F.3d 901, 908 (7th Cir. 2013) (citing *United States v. Perez*, 581 F.3d 539, 547 (7th Cir. 2009)). Here, the police suspected that the 48th Street residence was used to traffic drugs, knew that Slater and his brother (who sometimes stayed at the residence) had felony criminal histories, and had video evidence of a man believed to be Slater handling a rifle outside the residence during an apparent drug transaction. Given these facts, the large presence of law enforcement personnel, including some who were wearing protective gear and armed with long guns, was reasonable. And the officers forced entry into the residence only after the people inside refused to answer (and Slater's sister ran away from the door) despite the officers knocking and announcing their presence for nearly ninety seconds.

Finally, while I am troubled about the lack of video evidence from inside the residence (as well as Slater's allegation that several body-cam videos were inexplicably deleted), that concern alone does not render the entire bedroom search unreasonable. The police had reasonable suspicion under Act 79 to search Slater's bedroom, and Slater has not alleged that anything nefarious happened during the execution of that search. In sum, Slater has not demonstrated that the police conducted the Act 79 search in an unreasonable manner.

The search of Slater's bedroom also was reasonable under the Fourth Amendment, as the police had reasonable suspicion that Slater, a probationer subject to a search condition, was engaged in criminal activity. *See Knights*, 534 U.S. at 121.

## II. Search of the rest of the 48th Street Residence

Slater contends that the police also violated the Fourth Amendment when they searched the rest of the 48th Street residence without a warrant. He maintains that the protective sweep, during which the police allegedly first observed the firearms under an armoire in Flores' (his adult sister's) bedroom, was invalid because it was conducted as standard protocol rather than based on articulable facts to believe that a dangerous person may be hiding in the residence. He also maintains that the police exceeded the scope of the sweep both in time (in his estimation the sweep lasted too long—around forty minutes) and in the areas searched (according to Slater, the police had no reason to believe a person could be hiding behind the armoire, which they apparently moved to find the hidden guns). Moreover, Slater claims that Yursky (his stepfather and the owner of the home) did not have authority to consent to a search of Flores' bedroom because she was an adult cohabitant of the residence and, even if he did, his consent was tainted by his unlawful seizure and the unlawful protective sweep. The government contends that the police conducted a valid protective sweep; the police observed the firearms behind the armoire in plain view; Yursky, as the homeowner, had authority to consent to a search of the entire residence; Yursky freely and voluntarily consented to the search; and even if the police exceeded the scope of the protective sweep, the firearms would have inevitably been discovered during the lawful consent search.

I asked for supplemental briefing because the parties had not addressed the problem raised by the fact that Slater is objecting to the search of his adult sister's bedroom. "The Supreme Court has consistently held that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). In other words, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

Although sometimes (perhaps erroneously) referred to as "standing," the Supreme Court has explained that whether a defendant can challenge a search is an issue of substantive Fourth Amendment law. *See Carlisle*, 614 F.3d at 756 (citing *Rakas*, 439 U.S. at 143). That substantive law "protects against warrantless intrusions by the government into areas in which that individual holds a reasonable expectation of privacy." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (citing *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)). "A defendant seeking to suppress the fruits of a search bears the burden of demonstrating both that he held an actual subjective expectation of privacy and that the expectation 'is one that society is prepared to recognize as reasonable.'" *Villegas*, 495 F.3d at 767 (quoting *Yang*, 478 F.3d at 835). "In determining whether a defendant held a subjective expectation of privacy, [reviewing courts] look at the defendant's efforts to conceal and keep private that which was the subject of the search." *Villegas*, 495 F.3d at 767 (citing *Yang*, 478 F.3d at 835). "To say that society is prepared to recognize an expectation of privacy as reasonable 'recognizes the everyday expectations of privacy that we all share.'" *Villegas*, 495 F.3d at 767 (quoting

24

*Minnesota v. Olson*, 495 U.S. 91, 98 (1990)). "Thus, [the court's] inquiry into whether a defendant's expectation of privacy was reasonable is necessarily fact dependent, and whether a legitimate expectation of privacy exists in a particular place or thing must be determined on a case-by-case basis." *Villegas*, 495 F.3d at 767 (citations and internal quotation marks omitted).

Slater has made minimal effort to demonstrate that he had a legitimate expectation of privacy in Flores' bedroom or the contraband found therein. He first maintains that the government waived the issue by not challenging it during the first round of briefing. I disagree. Unlike in our case, the waiver cases cited by Slater did not involve the motions court (in this case, me) raising the issue *sua sponte* before deciding the defendant's motion to suppress. Also, it is Slater's burden to demonstrate a legitimate expectation of privacy. The government therefore did not waive the issue.

Slater also maintains that he had a reasonable expectation of privacy in the entire residence and that he doesn't have to show an expectation of privacy in particular parts of the home, like his sister's bedroom. He cites several cases that he thinks support this position, *see* ECF No. 31 at 2–7 (discussing cases), but his reliance on those cases is misplaced. Most of the cases Slater cites did not confront the issue we face here: whether a resident who doesn't own the home has a reasonable expectation of privacy in a bedroom that is exclusively used by another resident. (Slater does not make any attempt to demonstrate that he had any privacy interest in Flores' bedroom.)

The few cases Slater cites that did address this issue do not bind my decision, and they have limited persuasive value. Some are distinguishable factually because the police *unlawfully*

25

entered a shared residence to conduct the search.[6] In that scenario, "any resident has standing to contest an illegal entry onto the residence." *Virgin Islands v. Joseph*, 45 V.I. 132, 136 (2002) (quoting *State v. Hill*, 713 N.E.2d 73, 76 (Ohio Ct. App. 1998)). In our case, however, the police lawfully entered the 48th Street residence to arrest Slater and search his bedroom; the issue is whether the subsequent search of Flores' bedroom comported with the Fourth Amendment. This lawful/unlawful entry distinction is highlighted by Professor LaFave, who notes that when the Supreme Court held that a grandson had standing to challenge the search of his grandmother's home, his standing was "a consequence of an illegal entry of the premises." 6 Wayne R. LaFave, Search and Seizure § 11.3(a) (6th Ed. 2020) (citing *Bumper v. North Carolina,* 391 U.S. 543 (1968)). "On the other hand," LaFave suggests, "if the police entry of the premises was lawful and the only conduct subject to challenge is the entry thereafter into a room as to which the grandson has no expectation of privacy, then he well might be found to lack standing to challenge that conduct . . ." *Id.* That's exactly the scenario we have here: a legal home entry, followed by a search into an area where the defendant lacked any reasonable expectation of privacy.

The other cases Slater cites are not on solid legal footing to the extent they define the area searched too broadly. As noted above, the Supreme Court has instructed lower courts to apply a fact-based, case-by-case approach when analyzing whether a legitimate expectation of privacy exists. Finding a reasonable expectation of privacy in an entire residence, without considering any particular facts and circumstances, is inconsistent with this mandate. Indeed,

---

[6] These cases rely principally on *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990), a case where the Supreme Court held that overnight guests have a reasonable expectation of privacy in the home of their host. But the Supreme Court in *Olson* was not asked to decide whether the guest had a legitimate expectation of privacy in the host's bedroom. *See United States v. Dowell*, No. 93-5976, 1994 U.S. App. LEXIS 21155, *4 (4th Cir. Aug. 10, 1994) ("*Olson* does not suggest that an overnight guest has a legitimate expectation of privacy in every area of his host's home.").

courts have limited the reach of the Fourth Amendment to parts of homes. *See, e.g.*, *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) ("[T]he question before us is not whether Davis had a legitimate expectation of privacy in the contents of the apartment generally, but whether he could reasonably believe that the contents of his gym bag would remain private."); *Dowell*, 1994 U.S. App. LEXIS 21155, at *4 (finding that defendant had "some degree of privacy in his mother's house" but not in every area of her home); *United States v. Jenkins*, 426 F. Supp. 2d 336, 340 (E.D.N.C. 2006) ("Even if Jenkins was an overnight guest or frequent visitor, a visitor's legitimate expectation of privacy in the dwelling place . . . does not necessarily extend to all areas of the dwelling."); *Hill*, 713 N.E.2d at 77 ("[W]hen a parole officer is legally on the premises pursuant to the parolee's prior consent, but illegally searches the bedroom of another resident, the parolee generally does not have standing to object to the search of the other resident's bedroom.").

Turning to the facts of our case, I find that Slater arguably had a subjective expectation of privacy in Flores' bedroom. Slater has not presented any facts suggesting that he had shared dominion or control over his sister's bedroom or that he had a right to exclude others from that room. *See United States v. Peters*, 791 F.2d 1270, 1281 (7th Cir. 1986) (listing factors courts consider in determining whether a defendant has a legitimate expectation of privacy in a particular area); *see also United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. 1981) (applying the same factors used by the Seventh Circuit in *Peters* to a search of a residence); *Joseph*, 45 V.I. at 136 (listing other factors specific to a shared-residence situation). Also, Slater was arrested in a different bedroom, and Yursky told the police that Slater and Flores occupied separate bedrooms. Nevertheless, by hiding guns under his sister's armoire and drugs inside her laundry hamper, Slater exhibited a subjective expectation that those items "would remain

27

free from public examination." *Davis*, 332 F.3d at 1168 (quoting *United States v. Chadwick*, 433 U.S. 1, 11 (1977)); *see also Haydel*, 649 F.2d at 1155 ("[I]t is clear from his actions that Haydel exhibited a subjective expectation that the contents of the box stowed under his parents' bed were to remain private."); *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009) ("We are satisfied that Rheualt's [sic] decision to place the gun and drugs inside the washing machine on the third-floor landing sufficiently evidences an intent to hide them, and thus demonstrates a subjective expectation of privacy."); *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (defendant's conduct of storing items inside a bedroom closet in a closed bag demonstrated a subjective expectation of privacy); *but see Hill*, 713 N.E.2d at 77 ("And we respectfully disagree with the trial court that Hill's alleged attempt to hide the drugs in his mother's bedroom to evade detection by his parole officer, alone, conferred a reasonable expectation of privacy upon Hill in his mother's bedroom.").

To the extent that Slater had a subjective expectation of privacy in Flores' bedroom, I find that expectation was objectively unreasonable. Flores told the police that she did not own any firearms and that the drugs and drug-trafficking materials were not in her hamper when she folded laundry the morning of the search. Although Slater initially denied knowing about the firearms found in Flores' bedroom, he eventually admitted to holding onto them for someone else. Also, Slater's DNA was found on the handgun. These facts suggest that Slater hid the items in his sister's room when he heard the police knocking at the front door, knowing that he was on probation and that his room likely would be searched. Regardless, Slater's expectation that the items would be shielded from search by law enforcement stemmed from the fact that he did *not* have a privacy interest in his sister's bedroom, thereby defeating his ability to challenge the search of that room. In other words, society would not tolerate a

28

defendant being allowed to have his cake and eat it, too: he can't distance himself from the contraband by stashing it in someone else's room and then later claim that somehow he is offended by the police searching that room. *See Hill*, 713 N.E.2d at 77 (finding no expectation of privacy where parolee hid contraband in his mother's bedroom to evade detection by his parole officer). Moreover, there is no evidence that Flores knew Slater stored his contraband in her bedroom or permitted him to do so. Slater therefore could not reasonably expect that Flores was willing to share her privacy interest in her room with her brother, and his presence in her room to hide contraband was wrongful. *See Jenkins*, 426 F. Supp. 2d at 341 ("Where one wrongly places contraband within the house of another, without the knowledge of or authorization from the owner, no reasonable expectation of privacy arises.").

Presented with similar circumstances, other courts have found an expectation of privacy to be absent. *See, e.g.*, *Dowell*, 1994 U.S. App. LEXIS 21155, at *4 ("Dowell alleged no facts in the district court which could support a finding that he had a reasonable expectation of privacy in his sister's bedroom or in her jacket, including the right to exclude others from it."); *Hill*, 713 N.E.2d at 77 (finding that defendant did not have a reasonable expectation of privacy in his mother's bedroom); *Joseph*, 45 V.I. at 136–37 ("Although Defendant resided on the premises, he did not establish that he had a reasonable expectation of privacy in the storage room searched or the items found therein."); *United States v. Koepnick*, No. CR-09-065-S-BLW, CR-09-064-S-BLW, 2009 WL 2591683, 2009 U.S. Dist. LEXIS 74147, at *4–10 (D.C. Idaho Aug. 20, 2009) ("Absent case law directly on point, and without further evidence in the record, this Court is reluctant to conclude that society would recognize Marcus Koepnick as having a reasonable expectation of privacy in his father's bedroom."); *United States v. Prudente*, No. 1:05-CR-324-CAP, 2006 WL 8440223, 2006 U.S. Dist. LEXIS

29

109200, at *60–63 (N.D. Ga. July 19, 2006) (finding that defendant lacked a reasonable expectation of privacy in his mother's or sister's bedroom closet).

Assuming for the sake of argument that Slater did have a reasonable expectation of privacy in Flores' bedroom (and under her armoire and inside her hamper), I would still recommend that his motion be denied. Recall that Act 79 permitted law enforcement to search Slater's residence and any property under his control. If, as Slater alleges, he had a reasonable expectation of privacy in the entire house (including Flores' bedroom), then the entire house would be subject to search under Act 79. *See, e.g.*, Milwaukee Police Department Standard Operating Procedure 085 – Citizen Contacts, Field Interviews, and Search and Seizure, § 085.75(E) (effective Oct. 8, 2021) ("If the probationer . . . lives with someone else, any search shall be limited to common areas or those under the control of the probationer."), *available at* https://city.milwaukee.gov/ImageLibrary/Groups/mpdAuthors/SOP/085-CITIZENCONTACTSFIELDINTERVIEWSSEARCHANDSEIZURE.pdf; City of Madison Police Department Standard Operating Procedure – Probation and Parole Searches, p. 1 (effective Nov. 19, 2019) ("If the probationer . . . lives with someone else, any search must be limited to common areas or those under the control of the probationer."), *available at* https://www.cityofmadison.com/police/documents/sop/PPSearches.pdf. In other words, his argument is essentially self-defeating. If he does have a sufficient connection with his sister's room that would warrant an expectation of privacy, then that would open the area up to search under Act 79.

Ultimately, because Slater has failed to demonstrate that he had a reasonable expectation of privacy in Flores' bedroom, he has not met his burden of showing that the search of that room (where the police found two firearms, drugs, and indicia of drug

30

trafficking) violated his Fourth Amendment rights. Thus, I do not need to address Slater's arguments about whether the protective sweep and consent searches were lawful.

## CONCLUSION

For all the foregoing reasons, I **RECOMMEND** that the defendant's motion to suppress, ECF No. 24, be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated in Milwaukee, Wisconsin, this 21st day of October, 2021.

STEPHEN C. DRIES
United States Magistrate Judge