UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

                                    Case No. 21-cr-106-pp

  v.

SHAQUILLE O. SLATER,

          Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 37), ADOPTING REPORT AND RECOMMENDATION (DKT. NO. 34), AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 24)**

After months of an investigation into drug activity, and possessed of evidence that the defendant had violated the terms of his felony probation, officers executed an apprehension request issued by the defendant's probation agent. They searched the defendant's residence, found drugs and guns and arrested the defendant. Eight months later, a grand jury in this district indicted the defendant on charges of possessing guns and drugs. The defendant filed a motion to suppress, accusing the government of gutting the Fourth Amendment by descending on his home "as if they were conducting a military raid against a terrorist cell in Fallujah." Dkt. No. 24 at 27. He asked the court to suppress all evidence that the officers obtained during the allegedly unlawful apprehension and search. Id. at 29. The government responded with a very different version of the events: officers reasonably executed the probation officer's apprehension request, lawfully searched the

1

defendant's bedroom under Wisconsin's Act 79,[1] conducted a protective sweep and then searched the home after obtaining consent from the defendant's stepfather and mother. Dkt. No. 28. Despite the differing characterizations of the facts, the parties agree on most of those facts and neither side requested an evidentiary hearing.

Magistrate Judge Stephen C. Dries issued a report and recommendation on October 21, 2021, recommending that this court deny the motion to suppress. Dkt. No. 34. Judge Dries found that the apprehension request and Act 79 permitted the search of the defendant's bedroom, which was conducted in a reasonable manner. Id. at 13-22. He found that the defendant did not have a reasonable expectation of privacy in his adult sister's bedroom and that even if he did, Act 79 permitted the search. Id. at 28-31.

The defendant filed an objection on November 12, 2012, accusing Judge Dries of reaching a "radical conclusion" that the defendant had an expectation of privacy in only some areas of his home. Dkt. No. 37. The tone of the objection is dramatic and condemnatory, with the defendant accusing officers of brazenly breaking down doors, lying about a search warrant, turning off body cameras and deleting body camera videos. The government filed its response to the objection on November 29, 2021, after receiving an extension;

---

[1] 2013 Wisconsin Act 79 created what is now Wis. Stat. §973.09(1d), which provides that a person on probation for a felony—as well as the person's residence, and any property under the person's control—may be searched by law enforcement if the officer reasonably suspects that the person is committing, is about to commit or has committed a crime or a violation of the conditions of probation.

it accuses the defendant of wanting to eat his cake and still have it—of trying to distance himself from locations where evidence was found while asserting standing to challenge searches of those areas. Dkt. Nos. 39, 40.

It probably would have helped the court (both Judge Dries and this court) understand sequence of events and the layout of the home if the parties had sought and participated in an evidentiary hearing, but the record agreed to by the parties does not support a finding that the officers acted in a way that was "arbitrary, capricious or harassing." The court will adopt Judge Dries's recommendation and deny the motion.

## I. Background

Neither party objected to Judge Dries's factual findings, which were taken from the briefs or the defendant's Exhibits 1-4, which were provided on a flash drive to Judge Dries and the government. The defendant did not docket these exhibits or provide them to the clerk's office to make part of the file. The court since has asked the clerk's office to put a notation on the docket that those exhibits are available by request from the clerk's office's file. Docket Text at Dkt. No. 24.[2]

### A. Investigation of Drug Activity

In May 2020, a citizen who wished to remain anonymous because of safety concerns (Confidential Subject or "CS") contacted Brown Deer police

---

[2] District judges frequently are asked to review decisions of magistrate judges in which the magistrate judge viewed video or audio produced by one of the parties. In the future, it would be very helpful to this court (and presumably the other district judges) if parties would make such recordings part of the record by providing them to the clerk's office for inclusion in the case file.

3

about suspected drug activity at 8304 N. 48th Street in Brown Deer, Wisconsin. Dkt. No. 34 at 2. CS told law enforcement that lots of cars visited the residence throughout the day and that people from those cars would go into the residence, then leave a short time later. Id. CS said sometimes when a car showed up, a young, Black male would leave the house, get into the parked car for a short time, then go back to the house. Id. At other times, CS saw somebody arrive at the house, get out of the car carrying a black garbage bag, go in the house briefly, then come back to the car carrying a blue pillowcase. Id.

This information caused police to start investigating possible drug activity at the house. Id. at 3. Brown Deer Police Officer Tim Benway determined that the defendant was one of the people living at the 8304 N. 48th Street address. Id. at 3. "It was determined"—presumably by law enforcement— that the defendant was on felony probation for possession with intent to deliver marijuana; his probation conditions prohibited him from violating the law, possessing guns or ammunition, possessing illegal drugs and traveling outside the state of Wisconsin, as well as requiring him to submit to searches of his residence and property. Dkt. No. 28 at 2. Officers found the defendant's Facebook page and saw photographs of the defendant holding big stacks of cash (including a photo where he was holding a stack of cash and leaning against the hood of a gray Audi that appeared to be parked in the driveway of the 48th Street house). Dkt. No. 28 at 2-3; Dkt. No. 34 at 3. Officers also found posts referencing "ZaZa" (which, the government says, officers knew from their

4

training and experience to be a street name for marijuana), including one from April 8, 2020 reading, "ZaZa who wants it." Dkt. No. 28 at 3; Dkt. No. 34 at 3-4.

Between May and August 2020, CS continued to provide information to police, including video footage and photos of suspected drug activity at the 48th Street house. Dkt. No. 34 at 4. A video from May 28 showed a man wearing a red shirt and red shorts leave the house and exchange what appeared to be a bag of marijuana for cash with a person in a car parked in front of the house. Dkt. No. 34 at 4. Officer Benway shared this video with the defendant's probation officer, Jada Miller, who identified the man in the red shirt and shorts as the defendant. Id. A July 4 video showed a man (believed to be the defendant) leaving the house and handing something to the driver of a car parked in front. Id. A July 17 video showed a man matching the defendant's physical description leaving the residence carrying what looked like a long rifle, getting into a car parked outside the house, staying there for about twenty minutes, then returning to the house. Id. Videos from August 6 and August 24 showed the defendant "interacting with a vehicle outside the residence;" the defendant asserted that they showed no transaction. Id.; Dkt. No. 24 at 2-3. The government states that the defendant matched the description of the person observed on "numerous" of the surveillance videos and photos provided to law enforcement by CS. Dkt. No. 28 at 2.

Law enforcement conducted its own surveillance of the house on 48th Street. Dkt. No. 34 at 4. One officer reported that on June 25, 2020, he saw a

group of people arrive at the house, approach it, go inside for a short while, then leave; that officer also reported seeing the defendant and one of the individuals exchange money for a bag containing a white, powdery substance, but the defendant argued that the surveillance photos do not support that assertion. Id.; Dkt. No. 24 at 3 n.2. Officers also conducted surveillance on July 1 and July 7 but did not see anything worth noting. Dkt. No. 24 at 3.

Between June and August 2020 officers conducted five searches of the garbage left at the curb of the 48th Street house. Dkt. No. 34 at 4. During a July 10 garbage search, officers found the cover to a digital scale, a broken cell phone and several plastic baggies with the corners tied. Id. at 4-5. The remaining garbage searches did not turn up any contraband. Id. at 4.

CS gave the police a list of license plate numbers and descriptions of the cars that CS had seen at the 48th Street house. Id. at 5. Police learned that some of those cars were registered to people who had prior criminal drug histories, but the record contains no evidence that police conducted traffic stops of any of those cars leaving the house. Id. Nor does the record indicate that police conducted controlled buys from the defendant, tracked his whereabouts or monitored his phone calls. Id.

B.     First Illinois Traffic Incident

On July 28, 2020 at about 2:04 p.m., the defendant was arrested and cited in Illinois for aggravated speeding and driving with a suspended license. Id. at 6. Jada Miller, the defendant's probation officer, was aware of this arrest.

6

C.    Second Illinois Traffic Incident

On August 25, 2020, at 1:57 a.m., an Illinois State Trooper observed a gray Audi sedan driving northbound on I-94 towards Wisconsin at speeds over 100 mph. Id. at 5. According to reports, the trooper attempted to stop the Audi, but the driver of the Audi did not pull over. Id. The trooper initiated a pursuit but terminated it because the Audi was going so fast. Id. A few minutes later, Wisconsin law enforcement saw the Audi, still traveling at a high rate of speed. Id. The Wisconsin trooper was able to see the license plate on the Audi, which was registered to Sheila King, the defendant's mother, at the 48th Street address. Id. From what Judge Dries could tell, the Wisconsin trooper shared this information with the Illinois police, who asked the Brown Deer Police Department for assistance. Id.

At approximately 3:15 a.m. on August 25, 2020, Brown Deer officers went to the defendant's residence to talk to Sheila King, who said that the defendant had left the residence in the Audi at approximately 9 p.m. the previous night and that he had not come back. Id. The officers confirmed that the Audi was not in the garage, then left. Id.

The next day, Officer Benway told Jada Miller that the defendant had fled from the Illinois police in his mother's gray Audi. Id. at 5-6. Benway told Miller that King had told police officers the defendant had left the residence hours before the Audi was observed speeding and fleeing from the Illinois police. Id. at 6. The next day, Benway talked to Miller again, telling her that the Illinois police had gotten surveillance footage of the Audi but had not been able to

7

identify the driver because of the speed at which the car was traveling and the dark window tint. Id.

      D.    Apprehension Request

As of the end of August 2020, Miller knew that the Brown Deer Police Department had been investigating drug activity at the defendant's residence since May of 2020. Id. She had seen a video taken by CS and had identified the defendant as the person who came out of the 48th Street house in red clothing and appeared to conduct a transaction with someone in a car. Id. at 4. She knew that, on July 28, 2020 at approximately 2:04 a.m., the defendant had been arrested—and cited in the State of Illinois—for aggravated speeding and driving with a suspended license. Id. at 6. She knew that there had been an incident involved the defendant's mother's gray Audi speeding in Illinois in the early morning hours on August 25. Id. On September 1, 2020, Miller issued an apprehension request for law enforcement to take the defendant into custody. Id. After she issued the apprehension request, the defendant missed two scheduled probation contacts (September 2 and September 8, 2020). Id.

      E.    Execution of the Apprehension Request

On September 15, 2020, an investigation team went to the defendant's residence to arrest him; Benway first confirmed with CS that the defendant was inside the home. Id. At approximately 9:06 a.m., officers surrounded the residence (a three-bedroom, single-family home). Id. at 7. The home has three bedrooms upstairs: King and her husband, David Yursky, occupied one room; the defendant occupied another room; and the defendant's sister, Christina

8

Flores, stayed in the third room with her nine-year-old daughter. Id. Yursky owned the home. Id.

The reports indicated that there were nine task force members present but Judge Dries found that the team consisted of nearly twenty law enforcement officers (Brown Deer police and members of the U.S. Marshals task force)—with the task force officers in military style fatigues, helmets, vests and shields. Id. at 6-7. Some carried long guns, pointed at the residence. Id. at 7. The task force officers knocked on the door and shouted into the residence to come to the door or the door would be breached. Dkt. No. 24, Ex. 1 at 00:33-1:20. According to the reports, the officers saw a woman, later identified as the defendant's sister Christina Flores, come to the door, then run when she saw the police. Dkt. No. 34 at 7. Law enforcement subsequently heard a female voice yelling from inside the residence, "the police are here!" Dkt. No. 28 at 5; Dkt. No. 34 at 7. Law enforcement continued knocking and announcing their presence, warning that they would breach the door if someone didn't let them in. Dkt. No. 34 at 7. No one answered those requests, so the officers broke down the door and went inside. Id. Judge Dries noted that video footage from Benway's body camera showed that the officers had been knocking for about ninety seconds before they breached the door. Id.

The investigative team instructed the occupants to exit. Id. Moments later, Flores and her daughter came out first. Id.; Dkt. No. 24 at 6; Dkt. No. 28 at 5. Flores confirmed that the defendant was inside the residence. Dkt. No. 28 at 5; Dkt. No. 34 at 8. Law enforcement continued to call out to the defendant

9

and other occupants but no one answered. Dkt. No. 28 at 5. The main level of the residence was cleared. Id. Despite the number of officers present, none of the officers wrote a report; no one activated their body camera. Dkt. No. 24 at 6. Although Benway wore a camera (Ex. 1), he did not participate in the breaking down of the door or the initial entry. Id.

After clearing the main level, law enforcement went up the stairs and made announcements toward the closed bedroom doors. Dkt. No. 28 at 5. The homeowner, David Yursky, appeared and was told to leave the residence. Id. Another male and female appeared; the male initially identified himself as Sedrick Slater but was, in fact, the defendant. Id. Sedrick Slater is the defendant's brother. Id. Moments later, the defendant admitted his real name, was removed from the residence by 9:10 a.m., was handcuffed and was placed in the back of a police squad car. Dkt. No. 34 at 7 (citing Dkt. No. 24, Ex. 1 at 0:03:58). The defendant had two Apple iPhones, a set of keys to the gray Audi and $310 in cash. Id. at 7, 8. The officers escorted the defendant's girlfriend out of the house, where she waited with Flores, Flores's daughter and another individual. Id. at 8. Yursky was handcuffed and escorted outside by 9:12 a.m. Id. at 8 (citing Dkt. No. 24, Ex. 1 at 0:06:06).

While the officers were checking the residence to make sure there was no one else inside, the defendant's mother, Sheila King, pulled up in the driveway. Id. at 8. She asked what was happening; Benway told her that they had a warrant for the house. Id. (citing Dkt. No. 24, Ex. 1 at 0:04:00-0:04:08). When King asked to see the warrant, Benway told her to get out of the car (which she

did). Id. (citing Dkt. No. 24, Ex. 1 at 0:04:08-0:04:43). Benway asked if Sedrick was home; King replied no and explained that Sedrick stayed there "off and on." Id. (citing Dkt. No. 24, Ex. 1 at 0:07:27-0:07:36). At around 9:15 a.m., one officer asked Benway if other officers were still inside, searching the residence. Id. Benway responded, "Yeah, they're searching the rest of the house. So we have Shaquile. I think they're still looking for Sedrick." Id. (citing Dkt. No. 24, Ex. 1 at 0:09:06-0:09:15).

Officers clearing the house found two firearms in Flores's bedroom. Id. at 8. Benway wrote a report about the events of September 15, 2020, stating, "I was also informed by Agent Leannais that while clearing the residence for persons inside, the USMS team located two firearms, an AR-15 rifle and a black handgun, hidden behind an armoir [sic] in the furthest southeast bedroom of the residence." Dkt. No. 24, Ex. 2; Dkt. No. 34 at 8. Investigators later photographed the armoire and the firearms. Dkt. No. 24 at 7; Dkt. No. 34 at 8. The armoire had been flush against the wall before the entry; officers moved the armoire to locate the guns but they did not seize the guns at that time. Dkt. No. 34 at 9. The photographs included in the defendant's brief and Judge Dries's report show an armoire whose left side has been pulled slightly away from the wall; the armoire appears to be positioned immediately to the right of a closet; visible behind the upper left portion of the armoire are a curtain rod and short curtains. It appears that when the officers arrived in the room, the armoire had been placed in front of a window blocking part of a doorless closet. Dkt. No. 24 at 7; Dkt. No. 34 at 9.

11

Officers searched defendant's bedroom. Dkt. No. 34 at 9. They found identifiers for the defendant in that room: a wallet containing his Social Security card and several other credit cards with his name on them. Dkt. No. 28 at 6. The officers also observed the following items in the defendant's bedroom:

- A large digital scale found on a top shelf in the closet,

- A manual for a Spartan adjustable laser sight for a firearm,

- Another digital scale located in a dresser drawer with suspected marijuana residue on it,

- Numerous THC retail packages labeled "Cheetah Piss" were located throughout the room. In one silk bag, officers located sixteen packages of "Cheetah Piss" each with package containing 3.3 grams of marijuana,

- Two boxes of unopened sandwich bags,

- A container of rubber bands,

- A large Ziploc bag containing other empty bags with suspected marijuana residue inside, and

- $5,000 located in a right drawer.

Dkt. No. 28 at 6. From the evidence available to Judge Dries, it appeared officers were in the home from 9:08 a.m. to 10:01 a.m. to clear the residence and search the defendant's bedroom. Dkt. No. 24, Exs. 1, 3, 4; Dkt. No. 34 at 9. Judge Dries noted that there is no video evidence of the officers clearing the residence, finding the guns or searching the defendant's room. Id.

While all of this was going on in the house, Benway was telling the defendant what was happening. Dkt. No. 34 at 10. Officer Daniel Hanson,

12

whose body camera was running, was also with the defendant. Dkt. No. 24, Ex. 4. At 9:18 a.m., Hansen told the defendant that they "wouldn't send the Marshals for a VOP hold, so there's got to be more to the story." Dkt. No. 24 at 8. At 9:31 a.m., Benway began talking to the defendant and explaining what was happening. Dkt. No. 34 at 10 (citing Dkt. No. 24, Ex. 1 at 24:15). Benway told the defendant that he had a felony warrant for violating his probation, and that the task force was a team that found and arrested people with felony warrants. Id. Benway told the defendant that Sedrick had "something out for him too." Id. The defendant asked why the officers were searching and "doing all that extra stuff;" Benway told him that was "standard protocol" and that they had to search the house to make sure it was empty. Id. (citing Dkt. No. 24, Ex. 1 at 24:48). When the defendant told Benway that the house should be clear and that there was no one else in there, Benway responded that it was a big house and there were lots of places to look. Id. (citing Dkt. No. 24, Ex. 1 at 23:58-25:08).

After Benway walked away, the defendant continued to speak to Hanson. Id. The defendant commented that the police seemed to be searching the house, not looking for people. Hanson explained that he didn't know what the search warrant allowed the officers to do; the defendant expressed surprise to hear there was a warrant. Hanson clarified that he assumed there was a search warrant to enter "based on his training and experience of how this went down." Id. at 10 (citing Dkt. No. 24, Ex. 4 at 34:24-0:35:15).

13

Benway approached Yursky and asked for consent to search the home. Id. (citing Dkt. No. 24, Ex. 3 at 23:18-23:24). This interaction was captured on body camera and the court has reviewed the exchange. Although Yursky had been handcuffed, he was moving freely at the time of the conversation (with officers standing nearby). Dkt. No. 24, Ex. 3 at 23:18-23:35. Yursky walked into the garage. Id. In asking for consent to search, Benway stated that the officers found "things" in the house that Yursky said he wasn't aware of. Id. at 23:35. King, who was standing by Yursky, said they couldn't search the home. Yursky told Benway that he thought they already had searched the house. Id. at 23:34. Benway explained that they had searched the defendant's room because he was on probation. Id. at 23:40-23:50. Yursky gave consent to search the remainder of the residence. King told Yursky not to consent and told officers that she didn't want them to search because her money was in there and she didn't want the officers taking it. Id. ATF Agent Matthew Mason told King that they were only concerned with drugs and guns and they weren't the IRS. Id. at 23:51-24:01. King then verbally granted consent to search, telling officers "oh you cleared that up. Go ahead and do what you do please. Okay, go ahead." Id. at 23:53. Yursky signed a written consent form. Dkt. No. 34 at 11. The consent form indicated that "this written permission to search without a search warrant is given by me to the officer voluntarily and without any threats, coercion or promises of any kind." Id. (citing Dkt. No. 24, Ex. 4 at 23:24-23:31).

14

According to reports, the police relied on Wisconsin's Act 79 (the statute that provides for the search of the person, residence and property of individuals on felony probation if there is reasonable suspicion to believe that they have committed or are planning to commit violations) and the consent from Yursky to search the defendant's bedroom. Dkt. No. 24, Ex. 2.

The police found the following items in Flores's room:

- A silk bag containing a digital scale, empty sandwich bags, a knotted plastic bag containing 56.5 grams of marijuana, a knotted bag containing 18.5 grams of amphetamines (71 pills). These items were buried in a laundry hamper.

- 1-DPMS, model AR-15, .223 caliber rifle, serial #FFH161838, loaded with nineteen rounds of .223 ammunition was found behind the armoire, and

- 1-Taurus, model G2C, 9mm, semi-automatic pistol, serial #ABD464131, loaded with one round in the chamber and ten rounds in the magazine was also found behind the armoire.

Dkt. No. 28 at 7. Officers searched the Audi and found identifiers for the defendant, as well as other small quantities of marijuana. Id. The total amount of marijuana recovered during the search was 167.7 grams. Id.

Officers spoke with Flores, who confirmed that the southeast bedroom was her bedroom. Id. When asked about the guns and drugs found in her bedroom, Flores stated that she never had owned a firearm in her life and that when she folded laundry that morning, there were no drugs in the laundry hamper. Id.; Dkt. No. 34 at 11.

The police reports indicated that eight Brown Deer officers had body cameras. Dkt. No. 24 at 11. Officer Benway activated his camera at 9:06 a.m.

and deactivated it at 9:43 a.m. Id. Officer Anthony Vogelsang activated his camera for the same period. Id. Despite remaining on the scene, obtaining consent and searching the home, neither Benway nor Vogelsang reactivated their cameras after 9:43 a.m. Id. For much of Benway's video, the audio has been removed. Vogelsang's body camera footage was deleted. Id. Other officers recorded only partial segments of events. Officer Guenette activated his camera only from 9:06 to 9:25 a.m. Id. Officer Joshua Morgan activated his body camera from 9:09 to 9:25 a.m. Id. Officer Nick Anderson activated his body camera from 9:16 to 9:18 a.m. Id. All these recordings were deleted. Id. Meanwhile, Officer Caddock recorded two videos: the defendant's Exhibit 3 runs from 9:42 to 10:47 a.m and a second video was recorded from 10:51 to 11:03 a.m. (and deleted). Id. Hanson recorded from 9:12 to 9:52 a.m. Id. None of the video recordings captures the events inside the home. Id. at 12.

On September 18, 2020, Special Agent Mason and Benway gave the defendant his Miranda warnings and interviewed him at the Milwaukee Secure Detention Facility. Dkt. No. 28 at 7. The defendant agreed to speak with law enforcement after being advised of and waiving his rights. Id. He admitted that the marijuana recovered from his bedroom was his and that he smoked daily; he denied that he sold marijuana. Id. He initially denied knowledge of the firearms recovered from Flores's bedroom but later admitted to knowing about—and handling—the firearms. Id. He stated that he had been asked to store the firearms for someone named "Rob Lee." Id.

16

The government indicated that on February 17, 2021, Special Agent Mason received and reviewed a confidential report of laboratory findings related to this investigation. Id. at 8. The government does not say what kind of lab report Agent Mason reviewed, but the context implies that DNA testing was done on the two firearms recovered from Flores's bedroom. The government indicated that the "swabs recovered from the grip of the AR-15 were found to contain a five-person mixture," but that "[t]his item was not suitable for comparison due to the complexity of the mixture." Id. Presumably "this item" was the AR-15 and it bore a mixture of the DNA of five individuals. The government also indicated that "swabs from the grip of the 9mm pistol were also found to contain a five-person mixture," and that "[i]t was determined that the source was a major male contributor." Id. The government represented that the defendant "was found to be the source of the DNA recovered from the pistol." Id.

Officers obtained a search warrant for the two iPhones the defendant had in his possession when he was arrested. Id. The government asserted that "[c]lear evidence of drug trafficking and mobile drug trafficking was observed through numerous text messages in which the defendant communicate[d] with many individuals to meet and sell them drugs." Id. The government represented that in the text messages, the defendant identified himself as "Shaq." Id. The government stated that it was "evident that the defendant was also selling pills," because in one message he told someone that he had thirty-five pills for sale at $5.00 per pill. Id. The government also stated that one of

17

the phones contained photos of the defendant "standing next to his vehicle with a large firearm resting on the interior of his vehicle," as well as a photo of the defendant holding a large quantity of cash. Id.

Finally, the government represented that "[m]essages from the defendant's Facebook account were also reviewed," presumably by law enforcement. Id. It stated that those messages revealed numerous marijuana transactions and evidence that the defendant was "holding onto a firearm, referred to as a 'chop' and an 'AR,' as collateral for a drug debt that was owed to him." Id.

F.    The Charges

On May 18, 2021, a federal grand jury indicted the defendant for unlawfully possessing the two firearms found behind the armoire, possessing with intent to distribute marijuana and possessing the two firearms in furtherance of drug trafficking activity. Dkt. No. 1.

II.    **The Motion to Suppress**

A.    The Defendant's Arguments (Dkt. No. 24)

The defendant argued that the September 15, 2020 search was unreasonable on four grounds. Dkt. No. 24. First, he asserted that Benway "procur[ed] a probation warrant through subterfuge." Dkt. No. 24 at 12. The defendant argued that rather than going to a judge to obtain a warrant to arrest him or search his home, the police went to his probation officer. Id. at 13. The defendant clarified that he was not challenging the ability of law enforcement to arrest probationers in their homes based on apprehension

18

requests like the one Miller issued. Id. But the defendant argued that in this case, Miller worked "almost exclusively" with Brown Deer residents on supervision, that her office was inside the Brown Deer Police Department and that when she conducted home visits, she often was accompanied by Brown Deer police officers, asserting that in contrast to a neutral and detached judicial officer, she was likely to be "deferential" to the officers. Id. at 14. That aside, the defendant also asserted that Miller issued the apprehension request based on "misinformation"—Benway's assertion that the defendant was driving the gray Audi on August 25, 2020 when it fled Illinois police. Id. He asserted that Benway "had to have known" that telling Miller that information as if it were a conclusive fact would cause Miller to issue the apprehension request. Id. He contended that within days of Miller issuing the request, "and unbeknownst to Agent Miller," Benway "seized on the opportunity and sought the Marshals task force's assistance in effecting the apprehension request." Id. He claimed that the law enforcement officers "used the apprehension request as an opportunity to conduct a full warrantless search" of his home and cited a Sixth Circuit case condemning the "tactic" of "circumventing the Fourth Amendment requirements by manipulating the time of a suspect's arrest to coincide with his presence in a place which government agents wish to search." Id. at 15 (quoting United States v. Carriger, 541 F.2d 545, 553 (6th Cir. 1976)). While conceding that the "dubious means" the officers used to obtain the apprehension request "do not warrant suppression," the defendant argued that

19

they bear on the "overall reasonableness of the search" and set the stage for the "warrantless searches that followed." Id.

Second, the defendant argued that the protective sweep was invalid because "it wasn't supported by a reasonable belief that the home contained a person posing a danger to the officers," and asserted that even if the sweep had been supported by such a belief, "the search vastly exceeded the narrow limits of a protective sweep." Id. at 15. The defendant asserted that the police were able to empty the house of occupants within two minutes or so of breaking the door down, yet they stayed and searched for another forty minutes, eventually finding the guns in Flores's bedroom. Id. He reminded the court that a protective sweep is quick and limited and is permitted only when police have a reasonable belief based on specific and articulable facts that the area being swept harbors someone who could pose a danger to officers or others. Id. at 15-16. The defendant argued that there was no justification for a protective sweep to begin with, noting that the officers themselves had indicated that they were following standard protocol rather than acting on some articulable danger. Id. at 17. He asserted that the officers had no reason to believe that the defendant's brother was in the house or that if they did, they had no reason to believe he posed a danger; he also asserted that it could not have taken forty minutes to find someone in a modest-sized home. Id. The defendant also argued that even had a protective sweep been justified, what the officers did exceeded the scope of a protective sweep. Id. at 18. He maintained that the officers did more than search in places where people might have been hiding,

20

referencing the fact that they moved a large armoire away from the wall to look under and behind it. Id. at 19.

Third, the defendant asserted that Yursky's consent to search was invalid because it came after officers had removed Yursky from the home, handcuffed him for almost thirty minutes, questioned him and kept him away from the residence. Id. at 21. He argued that even after officers uncuffed Yursky, "heavily armed officers were stationed next to him while additional officers were rummaging around inside his home." Id. The defendant argued that Yursky could not have felt free to disregard the police and go about his business. Id. He asserted that under these conditions, Yursky's consent was presumptively invalid. Id. at 22. He also argued that even if Yursky was not illegally detained by the time he consented, the consent was not sufficiently attenuated from the allegedly unlawful seizure, particularly given that the police confronted Yursky with the items they'd found in the house. Id. The defendant asserted that Yursky knew that withholding consent would have been pointless. Id. at 23.

The defendant also maintained that Yursky did not have the authority to consent to the search of "private bedrooms in the home that weren't his." Id. He asserted that the owner of a home does not have authority to consent to the search of an adult cohabitant's bedroom. Id. at 24. Thus, the defendant argued, Yursky's consent to search Flores's bedroom was invalid. Id. at 25.

Case 2:21-cr-00106-PP   Filed 02/24/22   Page 21 of 79   Document 41

Finally, the defendant argued that Act 79 did not permit a search of the house because any reasonable suspicion that may have existed was stale and because the search was not conducted in a reasonable matter. Id. at 25-29.

B.    The Government's Response (Dkt. No. 28)

The government responded that the search and seizure of evidence recovered at the defendant's residence on September 15, 2020 did not violate the Fourth Amendment based on a totality of the circumstances. Dkt. No. 28 at 11. First, the government asserted that Miller's apprehension request was within the scope of her authority and was supported by reasonable suspicion. Id. The government emphasized that the defendant had been the subject of a months-long drug trafficking investigation focused on his residence. Id. at 12. It asserted that the information Benway had given to Miller about the defendant's suspected presence in Illinois constituted a reasonable suspicion that the defendant had violated his probation conditions—particularly the fact that the defendant's mother had told Brown Deer Police that the defendant had taken her car hours before the officer in Illinois had observed the car. Id. The government noted that when the officers went to the defendant's home about an hour after the Illinois officer had seen the car, the car was not at the house. Id. The government disputed that Benway had given false information to Miller or left out critical facts; Miller knew that the Illinois trooper was not able to identify the driver. Id. Miller also knew about the prior arrest and citation in Illinois. Id. at 12-13. The government also argued that even if Miller had not issued the apprehension request, Act 79 still would have authorized the search

22

given that the information the Brown Deer Police Department had obtained from CS and from its own surveillance provided reasonable suspicion for an Act 79 search. Id. at 13.

Second, the government argued that the in-home arrest of the defendant posed an inherent danger to the officers. Id. It asserted that that danger was "amplified" by the fact that CS had provided law enforcement with video and photos of someone suspected to be the defendant handling a long rifle. Id. The government pointed out that there were multiple people living in the residence and that, when the defendant first encountered the police, he gave the name of his brother (whom the police knew to be on felony supervision and to have an apprehension request issued for him). Id. The government asserted that "[i]n conducting that protective sweep, officers observed two firearms, in plain view, behind a large armoire in one of the bedrooms." Id. The government asserted that the officers "continued to clear the residence and then conducted an Act 79 search of [the defendant's] bedroom." Id. at 14.

Third, the government asserted that both Yursky and King consented to the search. Id. The government stated that Yursky had been "briefly" detained when the officers first had showed up and cleared the residence, but that he was no longer in custody when he gave his written and verbal consent. Id. It maintained that Yursky's consent was not due to coercion and that he was "free to grant or deny consent and he readily consented to the search of the residence." Id. As for King, the government argued that she first objected to the search only because she was concerned about law enforcement taking her

23

money; it asserted that "[w]ithin minutes of denying consent" and after being advised that the officers weren't interested in her money, she "readily acquiesced to the consent search . . . ." Id.

The government distinguished a case cited by the defendant, United States v. Witzlib, 796 F.3d 799 (7th Cir. 2015), arguing that while the defendant in Witzlib adamantly objected to the search of his basement, Flores had not objected to the search of her room. Id. at 15. The government asserted that Flores was cooperative and that she denied the contraband found in her room was hers. Id. The government maintained that Yursky and King had authority to grant consent to search the entire residence, because they owned it, lived in it and exercised control over it. Id. at 16.

Finally, the government asserted that if the court concluded that anything about the apprehension request, the protective sweep or the Act 79 search was unlawful, the inevitable discovery doctrine would save the search. Id. at 16. The government asserted that if law enforcement had not looked behind the armoire during the protective sweep, the "evidence would have inevitably been discovered as the result of the lawful consent search." Id. at 17.

C.    The Defendant's Reply (Dkt. No. 29)

The defendant argued that the government had conceded in its response that "officers moved the armoire in [the defendant's] sister's bedroom," and argued that this took the search outside the scope of the protective sweep. Dkt. No. 29 at 1. The defendant also asserted that the government had failed to respond to several of his arguments and argued that that failure "implied

24

concession." Id. (citing Midwest Generation EME, LLC. v. Continuum Chem. Corp., 768 F. Supp. 2d 939, 950 (N.D. Ill. 2020)). In particular, the defendant argued that the government had not addressed his argument that Yursky's consent was "tainted by his illegal detention and that police exploited the illegal sweep by using items found during it to procure Yursky's consent." Id.

With respect to the protective sweep, the defendant reiterated that it was unlawful because Benway "repeatedly" asserted that the officers were conducting the sweep as "standard procedure." Id. at 2. The defendant also questioned the government's argument that his giving a false name increased the danger posed to the officers. Id. The defendant opined that once he had been removed from the house at 9:10 a.m., "there was no longer any articulable suspicion that somebody in the home posed a danger to the officers." Id. He pointed out that despite this fact, the officer continued the sweep until 9:44 a.m. Id. And to that point, the defendant maintained that the government hadn't responded to his argument that the search lasted too long to be a protective sweep and involved searching areas where people could not have been hiding—such as behind the armoire, which the defendant reiterated the government admitted that the officers had moved. Id. at 3. He asserted, "Moving items around constitutes a search," citing Arizona v. Hicks, 480 U.S. 321, 324-25 (1987). Id. The defendant argued that there was no reason for officers to believe that a person could have been hiding behind or under the armoire and that moving it, combined with the forty-minute duration of the sweep, transformed a protective sweep into a search. Id. at 4.

The defendant said that the government had stated in its response that the firearms were "in plain view" during the search and were only seized after they gained consent. Id. He argued that the guns were *not* in plain view, because Benway said in his report that the guns were behind the armoire. Id. He reiterated that the officers had to move the armoire to see the guns, which meant they were not in plain view. Id. The defendant also asserted that the whole reason officers asked for consent to search was because of the discovery of the guns during the "sweep" of Flores's room. Id. Thus, the defendant asserted, "the consent search was a continuation and byproduct of the illegal 'sweep,' as opposed to a distinct course of events." Id.

As for Yursky's consent, the defendant argued that the government had neglected to address his argument that Yursky had been unlawfully seized before he consented. Id. at 5. The defendant maintained that the government had not disputed that Yursky had been seized, nor had it argued that the seizure was lawful; it had argued only that by the time he consented, Yursky was no longer detained. Id. The defendant reiterated that while Yursky might not have been detained, he was not free to leave; "[h]is movements were still restricted by law enforcement, who were rifling through his home while tactical officers surrounded the home and his entire street was lined with police cars." Id. He also repeated his argument that Yursky's consent was not "sufficiently attenuated" from the allegedly illegal seizure, and asserted that the government had not examined the attenuation factors from Brown v. Illinois, 422 U.S. 590, 603-04 (1975). Id. at 6. The defendant argued that the temporal proximity of

26

the violation, the lack of intervening factors and the flagrancy of the violation supported a finding of taint. Id. As for the government's argument that Yursky could consent to the search of Flores's room because Yursky owned the house, the defendant asserted that "courts have been explicit that an ownership interest in property doesn't provide authority to consent." Id. at 7. He criticized the government for treating all areas of the home the same, asserting that while Yursky and King may have had the authority to consent to the search of common areas, they could not consent to the search of private bedrooms of other adults who lived there. Id. The defendant contended that the government had not borne its burden of demonstrating that Yursky's consent was given freely and voluntarily. Id. at 8.

The defendant argued that inevitable discovery did not apply because it presupposed the validity of the search when, in the defendant's view, the search was invalid. Id. He asserted that the government could not prove a chain of events that would have led to a warrant independent of the alleged Fourth Amendment violations. Id. at 8-9. He pointed to the Seventh Circuit's warning that the inevitable discovery doctrine should not "be invoked casually," and asserted that the government had presented only argument—not evidence—to support application of the doctrine. Id. at 9.

The defendant closed by repeating several arguments to which the government had not responded—the officers' failure to record much of what happened on September 15, 2020 on their body cameras (and failing to preserve much of what they did record), his argument that the officers used a

27

probation warrant to circumvent the Fourth Amendment warrant requirement, the fact that Benway lied about having gotten a search warrant and his argument that the search failed Act 79's reasonableness requirement. Id. at 9-10.

D.    Order Requesting Additional Briefing (Dkt. No. 30)

On September 22, 2021, Judge Dries issued an order requesting additional briefing on the issue of standing. Dkt. No. 30. Judge Dries determined that on the record currently before him, "it did not appear that the government infringed upon Slater's constitutional rights when law enforcement searched his sister's bedroom and found guns, drugs and drug-trafficking materials." Id. at 3. First, he observed that the defendant had not presented evidence to suggest that the police committed a trespass by entering a constitutionally protected area over which he (not his stepfather or sister) enjoyed property rights. Id. Second, he observed that the defendant had not presented evidence that he had a legitimate expectation of privacy in the items found under the armoire and inside the laundry hamper in his sister's bedroom. Id. Nothing that the parties had not briefed the issue and that the record contained insufficient facts to allow him to address it, Judge Dries gave the parties the opportunity to file supplemental briefs. Id. at 4.

E.    Supplemental Briefing on Standing (Dkt. Nos. 31, 32)

The defendant stated in his supplemental brief that there was "overwhelming authority" to support his claim of standing. Dkt. No. 31 at 1. He stated that he didn't raise the issue of his standing in the first brief because he

28

"viewed standing as a given." Id. at 3. The defendant asserted that the case
cited by Judge Dries, United States v. Prudente, No. 1:05-CR-324-CAP, 2006
WL 8440223 (N.D. Ga. July 19, 2006), in which the court found that a
defendant who lived with his mother did not have standing to challenge the
search of his mother's bedroom, was "wrongly decided" because it was "not
legally supported" by the cases cited within it and because it "ha[d] never been
cited as support for the proposition it purports to make." Id. at 4-5. The
defendant cited cases implying or holding that overnight guests have an
expectation of privacy in a host's home. Id. at 5-6. He referred Judge Dries to
other Supreme Court cases suggesting that standing is not confined to
particular areas in one's home. Id. at 6 (citing Bumper v. North Carolina, 391
U.S. 543 (1968)).

The defendant told Judge Dries that he had conferred with the
prosecution and that the prosecution had signaled its intent to argue that the
defendant did not have standing. Id. at 8. The defendant argued that the
government would have raised the argument had it truly believed the defendant
did not have standing, and that by not raising the issue in its opposition brief,
the government could be said to have waived it. Id. The defendant asked that
rather than focusing on whether he had an expectation of privacy in his home,
the court focus on whether "police conducted an illegal search of [the
defendant's] home under the guise of a protective sweep while they unlawfully
detained [the defendant's] stepfather, then sought to use his stepfather's

tainted and involuntary consent—which he lacked the authority to provide—as an end around to their unlawful search." Id.

A week later, the government filed its supplemental brief. Dkt. No. 32. It argued that the defendant "lack[ed] standing to challenge the consensual search of his adult sister's bedroom because he ha[d] failed to articulate any subjective, reasonable expectation of privacy in her bedroom, her armoire, or her laundry basket." Id. at 1. The government maintained that even if the court accepted the defendant's assertion of a privacy interest in Flores's bedroom, the search was "lawful as an extension of Act 79 based on [the defendant's] diminished expectation of privacy over areas which he claims protection." Id. The government pointed to specific facts that it asserted weighed against his assertion of a privacy right: the defendant and his sister did not share a bedroom, there was no evidence that the defendant had the right to exclude anyone from his sister's bedroom or that he took precautions to protect his own privacy in that room and the defendant's Social Security card, bank cards and other paperwork were in a separate bedroom that both the defendant and the "homeowner" identified as being the defendant's. Id. at 4-5. The government emphasized that in his Mirandized interview, when officers asked him about the guns in Flores's bedroom, the defendant had responded that the room was used by Flores, her daughter and occasionally, Flores's boyfriend; the government characterized this as the defendant "disavowing a possessory interest in his sister's room." Id. at 5. The government found it "evident" that "the defendant, knowing he was on supervision and knowing that his own room

30

was likely to be searched, ditched contraband in his adult sister's bedroom when he heard police at the door," stating that he had the opportunity to do so after Flores shouted that the police were there. Id. The government emphasized that Flores told police she'd never possessed any guns, that before she was escorted from the residence her bedroom door had been open and that "the contraband recovered from her bedroom had not been there before police arrived." Id. The government argued that "[o]n this record, there is simply no evidence to support any reasonable expectation of privacy that society would recognize in this case as it relates to [Flores's] bedroom and the court may find persuasion from [United States v.] Dowell[, 33 F.3d 53 (4th Cir. 1994)] based on those facts." Id. at 6.

Finally, the government argued that even if the court found that the defendant had some expectation of privacy in his sister's bedroom, "the evidence was still lawfully obtained based on his diminished protection of his Fourth Amendment rights to privacy under Act 79." Id. at 7.

## III.  Report and Recommendation (Dkt. No. 34)

On October 21, 2021, Judge Dries issued a thirty-one-page report recommending that this court deny the motion to suppress. Dkt. No. 34.

Judge Dries began with the apprehension request, rejecting the defendant's assertion that it was invalid because it allegedly was issued based on misinformation. Id. at 13. Judge Dries explained that, in Wisconsin, a probation agent may issue an apprehension request for a probationer if she has "reasonable suspicion that the probationer violated a probation term.'" Id.

31

(citing <u>Alston v. City of Madison</u>, 853 F.3d 901, 911 (7th Cir. 2017)). He recounted that an apprehension request "violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the [apprehension request] and the false statements were necessary to the determination that [an apprehension request] should issue." <u>Id.</u> at 13-14. Judge Dries found that the defendant had not demonstrated that Miller relied on misinformation when she issued the apprehension request. <u>Id.</u> at 14. He concluded that the defendant had not demonstrated that Benway provided false information or omitted critical facts; while Benway initially had told Miller that it was the defendant who was driving the speeding gray Audi that fled Illinois police on August 25. The government had indicated that the next day, Benway had told Miller that the trooper could not confirm the driver's identity, and that the defendant had not disputed this. <u>Id.</u>

Judge Dries also noted that "Miller did not need to be certain that [the defendant] was the driver of the Audi to issue the apprehension request." <u>Id.</u> He recounted that Benway also had told Miller that he had talked to the defendant's mother, who was the registered owner of the Audi, a little more than an hour after the Illinois trooper had observed the Audi speeding in Illinois, and that his mother had told police that the defendant had left the house in the Audi hours earlier and had not yet returned. <u>Id.</u> at 15. Judge Dries added that police had confirmed that the Audi was not at the residence at the time they talked to the defendant's mother. <u>Id.</u> Judge Dries found that

32

these facts provided Miller with "much more than a hunch" that the defendant likely had violated two conditions of his probation: that he not violate the law and that he not leave Wisconsin without Miller's permission. Id. at 15.

Judge Dries found that even if Benway had made a misrepresentation to Miller about whether the defendant had been identified as the person driving the Audi on August 25, Miller did not need that information to issue an apprehension request "because other, undisputed evidence supported Miller's reasonable suspicion that [the defendant] violated the terms of his probation." Id. He noted that the government had said that Miller knew of the ongoing investigation into drug activity at the house on 48th Street and knew that in July, the defendant had been arrested and cited in Illinois for speeding and driving with a suspended license. Id. Based on these facts, Judge Dries concluded that even leaving out the August 25 speeding incident in Illinois, Miller had enough facts to "order [the defendant] into custody at least to investigate those other allegations." Id. (citing Wis. Admin. Code DOC § 328.28(2)(a)).

Having concluded that the apprehension request was valid and supported by reasonable suspicion and that the police were authorized to execute it at the defendant's home, Judge Dries turned to the defendant's argument that police did not have reasonable suspicion to search his bedroom. Id. at 16. He noted that the defendant had argued that the information the police possessed was stale by the time of the September 15, 2020 search. Id. Judge Dries explained that it has long been the case that defendants on

33

supervision have diminished expectations of privacy under the Fourth Amendment, citing United States v. Caya, 956 F.3d 498, 500 (7th Cir. 2020). Id. He recounted the language of Act 79 (Wis. Stat. §973.09(1d)), which states that a probation may have his person, residence and any property under his control "searched by a law enforcement officer at any time during his . . . period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation." Id. Judge Dries cited a recent Wisconsin Supreme Court case explaining the "reasonable suspicion" in the context of an Act 79 search of an offender on extended supervision:

> Reasonable suspicion is a fairly low standard to meet. Although it is not possible to state precisely what the term reasonable suspicion means, it is a commonsense nontechnical conception . . . that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Such reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences form those facts, reasonably warrant that intrusion. A determination of reasonable suspicion is made based on the totality of the circumstances.

Id. at 17 (citing State v. Anderson, 389 Wis.2d 106, 122 (Wis. 2019)).

In light of this standard, Judge Dries looked at the totality of the circumstances: that in May 2020 the police had learned of the potential drug activity at the 48th Street address through CS (high vehicle traffic, brief interactions between people in the residence and people in those vehicles, someone going into the residence with a black garbage bag and coming out a short time later with a blue pillowcase); that the police had launched their own investigation and had learned that the defendant lived there and was on

probation for marijuana trafficking; that the police discovered a Facebook profile showing someone who appeared to be the defendant holding large amounts of cash and advertising ZaZa (marijuana) for sale; that through the summer of 2020 CS had provided police with videos of the defendant engaging in what appeared to be drug activity; that at least one garbage search had revealed the cover to a drug scale and corner-cut baggies; that the license plates of some of the vehicles that had visited the residence were registered to people with prior drug histories; and that one video had showed someone matching the defendant's description walk out of the house carrying what appeared to be a rifle. Id. at 17-18.

Judge Dries observed that the defendant did not dispute that these facts added up to reasonable suspicion; the defendant argued only that the information was too dated by the time the police executed the September 15, 2020 search. Id. at 19. Judge Dries disagreed, pointing to the August 25 incident in Illinois, which raised a reasonable suspicion that the defendant was fleeing the police. Id. Further, Judge Dries found that the case the defendant had cited in support of his staleness argument, United States v. Brooks, 594 F.3d 488 (6th Cir. 2010), was distinguishable because that search required probable case, while this one required only reasonable suspicion under Act 79. Id. He noted the ongoing pattern of activity at the 48th Street residence dating back to May of 2020, observing that "there is no evidence to suggest that [the defendant] stopped living at the 48th Street residence prior to the search or suddenly closed up shop on his apparent drug business." Id. at 19-20.

Judge Dries concluded that in addition to the police having reasonable suspicion that the defendant was engaged in drug trafficking, the totality of the circumstances also gave them reasonable suspicion that he had committed more than one violation of the conditions of his probation. Id. at 20. He recounted that the facts described above established reasonable suspicion that the defendant had violated the conditions that he not violate the law, that he not possess firearms and that he not possess illegal drugs. Id. Judge Dries further observed that police knew that the defendant had driving infractions in Illinois on July 28 and had possibly been involved in a high-speed chase in Illinois on August 25, which provided them with reasonable suspicion that he had committed further violations of the law and had left the state without his probation officer's permission. Id. Judge Dries disagreed with the defendant that it was unlikely that evidence of any of these violations might be found in his bedroom; Judge Dries reasoned that the police could have been looking for keys to the Audi, receipts or cell-phone activity showing that the defendant had been in Illinois on those dates, evidence from a cell phone showing the defendant's location. Id. Judge Dries found that "[t]hese specific and articulable facts—that [the defendant] likely violated his probation conditions—established an independent (and more recent) ground for the Act 79 search of [the defendant's] bedroom." Id. at 20-21.

Judge Dries next acknowledged that even if the officers had reasonable suspicion under Act 79 to conduct the search, the statute also required them to conduct it in a reasonable manner. Id. at 21 (citing Wis. Stat. §973.09(1d)).

36

He recounted the reasons the defendant had given for asserting that the search was not conducted in a reasonable manner—that "police misled [the defendant's] probation agent into issuing the apprehension request, exploited the apprehension request to arrest [the defendant] at his residence so they could conduct a warrantless search of his home, used excessive force to execute the apprehension request, and didn't adequately record or preserve body-cam videos of the events at [the defendant's] residence on September 15, 2020." Id. He noted that the defendant claimed that the police could have used less intrusive methods to apprehend the defendant, such as arresting him during a traffic stop, asking him to turn himself in or sending Miller to the defendant's residence with police officers. Id.

Judge Dries did not find these arguments persuasive, reiterating that he already had concluded that Benway had not misled Miller "into believing as a conclusive fact that [the defendant] was driving the Audi when it sped away from Illinois police on August 25." Id. He found that the police did not use the apprehension request as a "stalking horse"[3] to get around the Fourth Amendment, pointing out that Act 79 authorized law enforcement to search the defendant, his residence and any property under his control for suspected violations of the conditions of his probation. Id. Judge Dries stated, "[t]he efficiency realized in executing the apprehension request and the Act 79 search at the time does not make that search unreasonable," and added that because

---

[3] "A 'stalking horse' is '[s]omething used to cover one's true purpose; a decoy.' *The American Heritage Dictionary* 1751 (3d ed. 1992)." State v. Hajicek, 240 Wis.2d 349, 361 (Wis. 2001).

37

the defendant had missed the two appointments he'd had scheduled with Miller after she issued the apprehension request, she couldn't tell him about it or have him arrested during those appointments. Id. at 21-22.

As to the defendant's assertion that it was unreasonable for so many law enforcement officers to appear to conduct the search, and for them to force entry into the residence, Judge Dries recounted that

> the police suspected that the 48th Street residence was used to traffic drugs, knew that [the defendant] and his brother (who sometimes stayed at the residence) had felony criminal histories, and had video evidence of a man believed to be [the defendant] handling a rifle outside the residence during an apparent drug transaction. Given these facts, the large presence of law enforcement personnel, including some who were wearing protective gear and armed with long guns, was reasonable. And the officers forced entry into the residence only after the people inside refused to answer (and [the defendant's] sister ran away from the door) despite the officers knocking and announcing their presence for nearly ninety seconds.

Id. at 22.

Judge Dries conceded that he was troubled by the lack of video evidence of what happened inside the house (and the defendant's allegations that several body-cam videos had been deleted without explanation). Id. at 22. But he concluded that this did not render the entire search of the bedroom unreasonable, because the police had reasonable suspicion under Act 79 and because the defendant had not alleged that "anything nefarious happened during the execution of that search." Id. Judge Dries concluded that the police had conducted the Act 79 search in a reasonable manner. Id. (He also noted that the search was reasonable under the Fourth Amendment because the police had reasonable suspicion to believe that the defendant—"a probationer

38

subject to a search condition"—had been engaging in criminal activity. Id. at 23.)

Judge Dries then turned his attention to the defendant's arguments that the search of the rest of the house—particularly the defendant's adult sister's bedroom, in which the guns had been found—violated the Fourth Amendment. Id. He noted that he had asked for supplemental briefing "because the parties had not addressed the problem raised by the fact that [the defendant] [was] objecting to the search of his adult sister's bedroom." Id. at 24. He explained that this problem was not a standing problem, but a question of substantive Fourth Amendment law. Id. Citing cases in which the Supreme Court and Seventh Circuit had framed the question as whether the defendant had demonstrated that he had an actual, subjective expectation of privacy that society was prepared to recognize as reasonable, id., Judge Dries concluded that the defendant had made "minimal effort to demonstrate that he had a legitimate expectation of privacy in Flores' bedroom or the contraband found therein," id. at 25. Judge Dries addressed the defendant's assertion that the government had waived the issue by failing to address it during the first round of briefing, noting that the cases the defendant had cited did not analyze the situation in which a judge had raised the question *sua sponte* and that the burden was on the *defendant*, not the government, to show that he had a legitimate expectation of privacy. Id. As to the defendant's argument that he had a reasonable expectation of privacy in the entire house and that he did not have to show a particularized expectation in certain parts, like his sister's

39

room, Judge Dries found that the cases the defendant had cited "did not confront the issue we face here: whether a resident who doesn't own the home has a reasonable expectation of privacy in a bedroom that is exclusively used by another resident." Id. He found that other cases cited by the defendant had only limited persuasive value due to factual differences. Id. at 25-26. In particular, Judge Dries distinguished those cases in which someone could challenge the search of a home the person did not own because the police *unlawfully* entered the home; Judge Dries reiterated that in this case, the police *lawfully* entered the 48th Street residence. Id. at 26.

Although Judge Dries found that that the defendant had presented no facts suggesting he shared dominion or control over his sister's bedroom or that he had a right to exclude others from the room, that the defendant was arrested in a different bedroom—not in Flores's bedroom—and that Yursky had told officers that the defendant and Flores occupied different bedrooms, Judge Dries concluded, "by hiding guns under his sister's armoire and drugs inside her laundry hamper, [the defendant] exhibited a subjective expectation that those items 'would remain free from public examination.'" Id. at 27-28 (quoting United States v. Davis, 332 F.3d 1163, 1168 (9th Cir. 2003)).

Judge Dries concluded, however, that that expectation was "objectively unreasonable." Id. at 28. He recounted that Flores had told the police that she did not own any guns and that the drugs and drug-trafficking paraphernalia were not in her hamper when she folded laundry in the morning. Id. at 28. He recounted that the defendant initially denied knowing about the guns in

40

Flores's bedroom, but eventually admitted that he had been hiding them for another person. Id. Judge Dries recounted that the defendant's DNA was on the handgun. Id. He concluded that all these facts suggested that the defendant had heard the police knocking on the door and, knowing that he was on probation and that they'd likely search his room, had hidden the guns and the drugs in his sister's room. Id. Judge Dries found that the defendant's expectation that the items would remain private "stemmed from the fact that he did *not* have a privacy interest in his sister's bedroom, thereby defeating his ability to challenge the search of that room." Id. Judge Dries said,

> In other words, society would not tolerate a defendant being allowed to have his cake and eat it, too: he can't distance himself from the contraband by stashing it in someone else's room and then later claim that somehow he is offended by the police searching that room.

Id. at 28-29.

Judge Dries also observed that there was no evidence that Flores knew that the defendant had stored his contraband in her room or that she'd given him permission to do so. Id. at 29. That led Judge Dries to conclude that the defendant could not reasonably have expected that his sister was willing to share her privacy interest with him, and that his entering her bedroom to hide his property was unlawful. Id. Judge Dries cited cases in which a defendant did not have an expectation of privacy in a mother's, father's or sister's bedroom. Id. at 29-30 (collecting cases).

Finally, Judge Dries concluded that even if the defendant had a reasonable expectation of privacy in Flores's bedroom (and the area under the

armoire and in the laundry hamper), he still would recommend that this court deny the motion to suppress because Act 79 permitted law enforcement to search the defendant's residence and any property under his control. Id. at 30. Judge Dries pointed out that if, as the defendant appeared to be arguing, he had a reasonable expectation of privacy in the entire house, then the entire house would be subject to search under Act 79. Id. Put another way, Judge Dries found the defendant's argument self-defeating. Id.

Because Judge Dries concluded that the defendant had failed to meet his burden to show that he had a reasonable expectation of privacy in his sister's bedroom, he had not demonstrated that the search violated the Fourth Amendment; consequently, Judge Dries did not address the defendant's arguments about whether the protective sweep and the consent searches were unlawful. Id. at 30-31.

## IV. Defendant's Objections (Dkt. No. 37)

The defendant objects, claiming that the case presents "myriad Fourth Amendment violations" that Judge Dries excused, "primarily by reaching the radical conclusion that [the defendant] had an expectation of privacy only in certain areas of his home." Dkt. No. 37 at 1. The defendant asserts that this "runs counter to the most fundamental principle of Fourth Amendment law: that people enjoy an expectation of privacy in their homes." Id. He asserts that the defendant "does have an expectation of privacy in his home, and not just his bedroom," and that he "has standing to challenge the plainly unlawful search in this case." Id.

42

Although the defendant admits that the "primary focus of his motion was, and remains, the unlawful search of Flores's bedroom," because that was where the officers found the firearms that provide the basis for Counts One and Three, id. at 7, he nonetheless recounted Judge Dries' legal findings and objected to *all* of them, incorporating all the arguments from his original motion, his reply brief and his supplemental brief. Id. at 6-7. The defendant then devotes the entirety of his objection to his assertion that he had a reasonable expectation of privacy in his sister's bedroom; he made no arguments relating to the other issues he'd raised in his original brief or reply.

The defendant characterizes Judge Dries's ruling as a "view that conferring an expectation of privacy on a person's entire home is too broad, as society would not tolerate a person hiding contraband in a family member's room and then claim to be offended by the police searching that room." Id. at 7. The defendant asserts, however, that "this is precisely the protection that the Fourth Amendment provides." Id. He argues that his "expectation of privacy in all of the rooms in his home, including his sister's room, isn't just one society recognizes as reasonable, it's 'the very core' of the Constitution." Id. at 8 (citing Silverman v. United States, 365 U.S. 505, 511 (1961)). The defendant maintains that this wasn't just the home of a family member—it was *his* home and he lived there. Id. at 9. He asserts that the armoire "was steps away" from his bed. Id. He argues that "the idea that a resident will only have standing if the initial entry is unlawful is simply not support in case law," and reiterates his citation of cases indicating that residents and overnight guests have an

43

expectation of privacy in an entire residence. Id. at 9-10. The defendant rejects

the line of cases cited by Judge Dries, including Prudente, 2006 WL 8440223,

at *20. Id. at 10. He maintains that Prudente and cases like it are "inconsistent

with the overarching Fourth Amendment principle that people enjoy an

expectation of privacy in their homes." Id. And the defendant cites cases in

which he says other courts have found a defendant's actions in hiding items in

another person's room to demonstrate a subjective expectation of privacy. Id. at

10-11. He says that the government wants to introduce against him at trial

evidence of his property taken from inside his home, and asserts that "[i]f the

Fourth Amendment does not apply here, it's hard to imagine it applying

anywhere." Id. at 11.

The defendant next asserts that Judge Dries did not object the merits of

his claim, but rather concluded, "in rote fashion, that if [the defendant] had

enough of an expectation of privacy to have standing to challenge the search,

then Act 79 would have permitted the search of the room, thereby rendering

the search lawful." Id. at 12. The defendant argues that there are "significant

problems with this reasoning." Id. The defendant maintains that the police

never attempted to justify the search under Act 79, and he argues that "with

respect to shared residences, Act 79 applies to those areas under the

probationer's control or common areas." Id. Asserting that a bedroom is not a

common area, he states that while he had "access to his sister's bedroom," he

did not have control over it. Id. Thus, he contends, Act 79 could not justify the

search of his sister's bedroom. Id.

44

The defendant argues that it follows from this that Act 79 is not sufficient to justify application of the inevitable discovery doctrine because for that doctrine to apply there must have been a "chain of events that would have led to a warrant (or another justification) independent of the search." Id. (quoting United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995)). He says the court would need to find that that chain of events "'would certainly, and not merely probably' have happened." Id. at 13 (citing United States v. Tejada, 524 F.3d 809, 813 (7th Cir. 2008)). The defendant asserts that for the inevitable discovery doctrine to apply, "the government would have to prove, with certainty, that an Act 79 search of that room would have happened." Id. He characterizes it as "impossible" to meet that burden here; he asserts that "the government would have to prove with certainty that the officers' understandings of their authority under Act 79 (which were correct) would have changed (to be incorrect), and that change in understanding would have prompted them to conduct an Act 79 search." Id. Finally, the defendant says that the *government* never has tried to justify the search as an Act 79 search, he says the government argues instead that it was a valid protective sweep and consent search. Id. He says he disagrees, but that this court "should analyze the search through those lenses." Id.

Next, the defendant objects that the search was plainly unlawful. Id. He asserts that it wasn't a protective sweep because it was not based on any particular belief that there was someone inside who posed a danger to the officers, that it wasn't limited in duration or scope and that the firearms the

45

officers found were not in plain view but under or behind the armoire. Id. at 13-14. He speculates that the officers realized they needed another justification for seizing the guns, so they "sought consent to search Flores's room from the home's owner." Id. He argues, however, that the police sought this consent only after they'd found the firearms through an allegedly illegal search. Id. He reiterates that Yursky's consent was tainted by his unlawful seizure. Id. He also maintains that Yursky lacked the authority to consent to the search of Flores's bedroom. Id.

The defendant says that he stands by his arguments that Benway misled Miller into issuing the apprehension request, but also says he "continues to recognize that the concerns surrounding the apprehension request don't, on their own, warrant suppression." Id. at 15. Nonetheless, he takes issue with Judge Dries's conclusion that there were grounds for the apprehension request aside from the information about the August 25 incident in Illinois. Id. He argues that Miller did not issue the apprehension request because of the ongoing drug investigation or because of the defendant's arrest and citation in Illinois in July 2020; he says that Miller did issue an apprehension request after the defendant's July arrest in Illinois, "investigated it, and ultimately dropped the hold." Id. He asserts—without explaining why—that Miller did not issue the apprehension request based on the ongoing drug investigation. Id.

As to his "stalking horse" argument—that the police used Miller to get around the Fourth Amendment—the defendant claims that a "recent realization bolsters that claim and undermines Benway's credibility." Id. He asserts, for

46

the first time in his objection, that Miller's notes show that after Benway sent her a photo of the defendant and told her that he'd been seen on video selling marijuana, Benway asked her "not to move on this yet." Id. at 15-16.

Finally, the defendant argues that "the search at issue here, including the events leading up to it and the manner in which it was executed, are simply not reasonable." Id. at 16. The defendant asserts that the search was made possible only by law enforcement using the probation officer as an "end-around" the Fourth Amendment and then, rather than simply advising the defendant of the warrant and arresting him, "break[ing] down the door, search[ing] the entire home, unlawfully detain[ing] the home's occupants, l[ying] about having a search warrant, turn[ing] off their body cameras at key points, and delet[ing] other body camera videos." Id.

## V. Government's Response to Defendant's Objection (Dkt. No. 40)

The government asserts that Judge Dries "properly concluded that [the defendant] lacks standing to challenge the search of his sister's bedroom." Dkt. No. 40 at 3. It argues that the defendant had the burden of proving that he had a privacy interest and it had to be *his* privacy interest. Id. at 3-4 (citing United States v. Salvucci, 448 U.S. 83, 91-93 (1980)). It emphasizes that any privacy interest asserted must be objectively reasonable. Id. at 4 (citing United States v. Villegas, 495 F.3d 761, 767 (7th Cir. 2007)). The government recounts that Judge Dries had suggested that the defendant hid the contraband in his sister's room when he heard the police knocking and says that "[s]ince [the defendant] did not use [his sister's] bedroom in any capacity other than to

47

simply hide contraband from police on the day of his arrest," Judge Dries found his expectation of privacy in his sister's room to be objectively unreasonable. Id. at 5. The government says that under the defendant's reasoning, "whether [the defendant] simply stashed the contraband when he heard the officers knocking is irrelevant because [the defendant] had a right to privacy in the entire home and that ends the inquiry." Id. The government says this can't be so, because the Supreme Court has "firmly disavowed the notion that property rights are the end of the inquiry." Id. at 6. The government urges the court to go beyond "whether [the defendant] felt it was his home" and look at his efforts to conceal and keep private the guns and the drugs. Id. The government emphasized Judge Dries's reasoning that adopting the defendant's argument would enable the defendant to eat his cake and still have it. Id. The government repeats Judge Dries's conclusion that even if the defendant had a subjective expectation of privacy in his sister's room, that expectation was unreasonable. Id. at 7.

To the extent that the defendant argues Act 79 cannot justify the search because he merely had access to—not control over—his sister's room, the government points to inconsistencies in the argument. Id. at 8. It notes that the defendant wants the court to find that he had a reasonable expectation of privacy in his sister's room for purposes of the Fourth Amendment, but also wants the court to find that he had no "interest" in his sister's room for the purpose of Act 79. Id. The government argues that the defendant

seeks to reconcile these contradictory positions by conceding that officers had the ability to search anywhere in the house—the

48

"kitchen, living room, shared bathrooms, garages, hallways, foyers, and the life"—except his sister's (and presumably parents') bedroom. [The defendant] concedes he had "access" to his sister's bedroom, but wants to distinguish this from "control."

Id. The government characterizes this as a "self-serving and unsupported position," and argues that if the defendant had enough of an interest in his sister's room to obtain a Fourth Amendment reasonable expectation of privacy, he could not argue that he had no control over the room for the purpose of Act 79. Id. The government asserts that the defendant makes a "meaningless distinction" between "access" and "control," in a way that would give defendants the ability to hide contraband but disclaim any control over the hiding place. Id.

The government asks the court to "at least find that officers lawfully obtained" consent from Yursky and King to search the residence. Id. at 9. It asserts that while Yursky was "briefly detained" when the officers initially cleared the house, he was not detained when he gave the officers consent. Id. at 10. The government maintains that Yursky and King had the authority to consent to the search of the entire home—including their daughter's bedroom—because they owned the home. Id. The government also asserts that while the officers found the firearms before they obtained consent, they would have discovered the firearms once they obtained consent for the search of [the defendant's] bedroom and found the indicia of drug possession and trafficking; it says that under the inevitable discovery doctrine, these items should be admitted into evidence. Id.

49

Addressing the apprehension request, the government notes the defendant's concession that the alleged misinformation provided to Miller about the defendant driving the Audi on August 25 does not warrant suppression and that he confines his arguments on this topic to the overall reasonableness of the search. Id. at 12. It asserts that the officers had conducted a months-long investigation, had observed the defendant on video engaging in suspicious activity and had obtained information, photos and videos from the confidential witness. Id. It characterizes as reasonable Benway's inference that the defendant had been driving the speeding Audi in Illinois on August 25, because the defendant's mother had told police that he'd left in the car hours before the speeding incident and when the officers went to the address an hour after the incident, neither the car nor the defendant were there. Id. The government says that Judge Dries reasonably concluded that Benway had given Miller all of the information about this incident—including the fact that the police could not identify the defendant as the driver of the Audi. Id.

The government responds in detail to the defendant's new argument about the comment in Miller's notes. Id. at 13.

Finally, the government responds to the defendant's assertion that the number of officers involved made the apprehension unreasonable and that law enforcement had less intrusive options. Id. at 13-15. The government asserts that the defendant "has only himself to blame" for the way the officers executed the apprehension request, noting that he missed the two appointments with Miller at which she could have informed him of the apprehension request and

50

that he refused to answer the door when the officers arrived. Id. at 14. It asserts that the number of officers was reasonable given evidence of drug trafficking and the video of the defendant with a gun. Id. The government maintains that the protective sweep was necessary because an in-home arrest is dangerous to begin with and the officers had information that the defendant had possessed a firearm. Id. The government also argued that the fact that multiple people lived in the house and that the defendant gave a false name when arrested (the name of his brother, who had an apprehension request pending) supported the need for a full protective sweep. Id. at 14-15.

## VI.  Standard of Review

Parties have fourteen days to file "specific written objections" to a magistrate judge's report and recommendation on a motion to suppress. Fed. R. Crim P. 59(b)(2). When reviewing a magistrate judge's recommendation, the district judge must review *de novo* the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1).

## VII.  Analysis

The motion to suppress targeted the entire chain of events, from Miller's issuance of the apprehension request to the search of the bedrooms. In his objections to the recommendation, however, the defendant conceded that the crux of the motion was the search of Flores's bedroom because the two guns

51

found in that room are the basis for Counts One and Three. Dkt. No. 37 at 7.[4] Nevertheless, the defendant has objected to "all of the legal findings" made in his summary of Judge Dries' recommendation. That summary includes the apprehension request and the Act 79 search of the defendant's bedroom, the remaining searches (the protective sweep and the consent search), the finding that the Act 79 search was based on reasonable suspicion and executed in a reasonable manner and the defendant's standing to challenge the search of Flores's bedroom. While not all of the defendant's objections were specific, the court will apply the *de novo* standard of review.

A.    Apprehension Request

Section DOC 328.27(2) of the Wisconsin Administrative Code provides that an offender on supervision "may be taken into custody and detained" for various reasons, including "investigation of an alleged violation of a rule or condition of supervision," "to determine whether to commence revocation proceedings" after a violation, for "disciplinary purposes" and to "prevent a possible violation by the offender." Wis. Admin. Code DOC §328.27(2).[5] The statute provides that "[w]henever feasible, [a probation employee] shall rely on law enforcement authorities to take an offender into custody;" it says that if law enforcement assistance is not available, "the employee shall decide whether to

---

[4] In his reply in support of the motion to suppress, the defendant stated that his "primary argument is that the protective sweep was unlawful." Dkt. No. 29 at 2.

[5] The defendant cited Wis. Admin. Code DOC §328.24, which provides that if an offender absconds, the probation officer "shall issue an apprehension request."

52

disengage and issue an apprehension request" or to take the offender into custody him- or herself. Wis. Admin. Code DOC §328.27(1).

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Citizens generally enjoy the right not to be seized or arrested absent probable cause, Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003); probationers and parolees, however, have a more limited liberty interest, see Morrissey v. Brewer, 408 U.S. 471, 480 (1972). A probation officer needs only a "reasonable suspicion that the probationer violated a probation term to issue an apprehension request." Alston v. City of Madison, 853 F.3d 901, 911 (7th Cir. 2011).

The record does not support the defendant's argument that officers "subverted the Fourth Amendment by procuring a probation warrant through subterfuge." Dkt. No. 24. Jada Miller, the defendant's probation officer, issued the apprehension request on September 1, 2020. By that time, she was aware that since May of that year, law enforcement had been investigating possible drug activity at the defendant's residence. She had seen a May 28, 2020 video of someone whom she identified as the defendant leaving the house and exchanging what looked like a bag of marijuana for cash with someone in a car out front. She knew that on July 28, 2020, the defendant had been arrested and cited in Illinois for aggravated speeding and driving with a suspended license. She knew that on August 25, 2020, Illinois police had attempted to stop a gray Audi bearing a license plate registered to the defendant's mother

Case 2:21-cr-00106-PP   Filed 02/24/22   Page 53 of 79   Document 41

speeding north toward Wisconsin. She knew that Benway originally had told her that the defendant had been driving that Audi, and that the next day Benway had told her that although Illinois police had surveillance footage of the Audi, they had not been able to identify the driver. Finally, she knew that the defendant's mother had confirmed that the defendant had left her house in the Audi hours before the August 25 speeding incident and that when the officers talked to the defendant's mother an hour or so after the incident, neither the defendant nor the car had returned. This information was more than sufficient to provide Miller with a "reasonable suspicion" that the defendant had violated several probation conditions—leaving the state without permission (possibly twice), committing traffic violations, possibly dealing drugs. Under §328.27, Miller had a basis for issuing the apprehension request.

The defendant says in his objection that he "stands by his arguments that Benway used [the defendant's] probation officer to circumvent the Fourth Amendment." Dkt. No. 37 at 15. He takes issue with Judge Dries's conclusion that Miller had reasonable suspicion to issue the apprehension request irrespective of the August 25 incident in Illinois. Id. He reasons that the July 2020 traffic arrest and citation were not the events that caused Miller to issue the apprehension request, because Miller previously had issued an apprehension request after that arrest but had investigated the incident and dropped the request. Id. He asserts—with no explanation—that it was not the ongoing drug investigation that caused Miller to issue the apprehension request. Id.

This argument implies that it was the August 25 incident in Illinois that caused Miller to issue the apprehension report and implies that Miller should not have relied on that incident. Presumably the reason the defendant believes Miller should not have relied on that incident is because of his continued insistence that the police "misrepresented" to Miller that the defendant was driving the speeding Audi that fled police in Illinois. It is not clear why the defendant continues to cling to his misrepresentation theory. The defendant has not disputed that on August 26, 2020—the day after he'd told her about the speeding Audi and *a week* before Miller issued the apprehension request—Benway clarified with Miller that the Illinois trooper could not verify the driver's identity. And even though the trooper could not identify the defendant as the driver of the Audi, the facts gave rise to a reasonable suspicion that the defendant was driving the Audi: the defendant's mother confirmed that he had left the house in the Audi hours before the incident; an hour or so after the incident the defendant had not yet returned with the car; and a month earlier, the defendant had been arrested and cited for traffic violations in Illinois—the same state where the Audi fled police on August 25.

In his objection, the defendant says that he "continues to recognize that the concerns surrounding the apprehension request don't, on their own, warrant suppression," but that he nonetheless feels compelled to address some of Judge Dries's comments. Dkt. No. 37 at 15. For example, the defendant asserts—conclusively—that Miller was not prompted to issue the apprehension arrest by the July 2020 arrest and citation in Illinois because Miller had

55

investigated the July arrest and had made the decision to drop the hold. While the defendant doesn't clearly state as much in his objection, this appears to be a version of his "staleness" argument from his earlier briefs—that Miller had received the drug investigation information earlier in the summer and that the Illinois arrest and citation had occurred a month earlier without Miller taking action. The defendant points to no authority stating that a probation officer must issue an apprehension request the moment she becomes aware of a violation. And, as discussed above, the information about the defendant's mother's gray Audi speeding through Illinois and fleeing police an hour before officers confirmed that neither that Audi nor the defendant were at home was more recent and was sufficient to provide Miller with a reasonable suspicion that days before she issued the apprehension request, the defendant had been out of state without permission and had committed, at the very least, driving infractions.

The defendant argues that Miller's notes from June 2, 2020 support his argument that Benway used Miller as a "stalking horse" to circumvent the First Amendment; he claims that this argument is the result of a "recent realization." Id. The notes state:

> Received email from Officer Benway BDPD to Identify a picture, agent Identified as ^. He is on video selling a large quantity of marijuana. You can see him hand over the bag and receive money. ^ is driving a new Silver Audi. Officer Benway asked us not to move on that yet.

Dkt. No. 37 at 16. Although the court could point out that the notes predate some of the photos and videos provided by CS, the trash pulls, the July citation

56

for speeding in Illinois and the August 25 incident (in which officers had a reason to believe that the defendant was driving the Audi that fled the Illinois trooper), there is another problem with this argument: the defendant did not make the argument to Judge Dries. The Seventh Circuit has explained that

> [o]ur cases . . . indicate that arguments not made before a magistrate judge are normally waived. See, *e.g.*, *Divane v. Krull Electric Co.*, 194 F.3d 845, 849 (7th Cir. 1999). It is also true that we have said that waiver is a flexible doctrine, see *Old Ben Coal Co. v. Director, Officer of Workers' Compensation Programs*, 62 F.3d 1003, 1007 (7th Cir. 1995), but there are good reasons for the rule that district courts should not consider arguments not raised initially before the magistrate judge, even though their review in cases governed by 18 U.S.C. §636(b)(1) is *de novo*. Failure to raise arguments will often mean that facts relevant to their resolution will not have been developed; one of the parties may be prejudiced by the untimely introduction of an argument . . . . Additionally, a willingness to consider new arguments at the district court level would undercut the rule that the findings in a magistrate judge's report and recommendation are taken as established unless the party files objections to them.

United States v. Melgar, 227 F.3d 1038, 1040 (7th Cir. 2000). Too frequently, this courts is presented with arguments not made to the magistrate judge. In this case, the court will not remand the case to Judge Dries so that he may consider the argument not presented to him; it will disregard the argument. In future, the court may be forced to remand cases where a party raises an issue for the first time before the district court.

The defendant *did* make the "stalking horse" argument to Judge Dries, albeit without mentioning Miller's notes. In the motion to suppress, the defendant cited United States v. Giannetta, 909 F.2d 571, 581 (1st Cir. 1990) and United States v. Jarrad, 754 F.2d 1451, 1454 (9th Cir.), *cert. denied*, 474

U.S. 830 (1985) in support of his assertion that the "dubious means" the officers used to "obtain the apprehension request" called into question the "overall reasonableness of the search." Dkt. No. 24 at 14-15. In <u>Giannetta</u>, the defendant argued that police were the true initiators of the searches and that the probation officer's searches "were merely a subterfuge for a criminal investigation being conducted by police." <u>Giannetta</u>, 909 F.2d at 581. The defendant correctly quotes the <u>Giannetta</u> court as saying that "[c]ourts have uniformly held that probation and parole officers may not serve as 'stalking horses' for the policy by initiating searches solely for police purposes in order to help police circumvent the fourth amendment's warrant requirements." <u>Id.</u> (citing <u>United States v. Cardona</u>, 903 F.2d 60, 65-66 (1st Cir. 1990); <u>United States v. Jarrad</u>, 754 F.2d 1451, 1454 (9th Cir.), *cert. denied*, 474 U.S. 830 . . . (1985)). But the defendant did not recount the next part of the <u>Giannetta</u> court's decision:

> The mere presence of police during a probation search, however, does not transform the search into a police search. *See United States v. Jeffers*, 573 F.2d 1074, 1075 (9th Cir. 1978) (per curiam). Nor is mutually beneficial cooperation between probation officers and other law enforcement officials precluded. *See United States v. Conseulo-Gonzalez*, 521 F.2d 259, 267 (9th Cir. 1975) (en banc).

<u>Id.</u>

The Wisconsin Supreme Court has discussed this issue. In <u>State v. Hajicek</u>, 240 Wis.2d 349, 366 (Wis. 2001), the Court explained:

> Cooperation with law enforcement for the purpose of preventing crime is a specific goal of probation supervision. Wis. Admin. Code § DOC 328.01(5) (June, 1999). The regulations in the Wisconsin Administrative Code provide that a specific goal of probation

58

supervision is "[t]o cooperate with other public and private agencies in activities for the purpose of prevention of crime and to provide alternatives to institutionalization." *Id.* In addition, Wisconsin precedent supports probation searches based on cooperation between probation officers and law enforcement. For example, the fact that the police provide the information that leads to a probation search does not make the probation search unlawful. *State v. Griffin*, 131 Wis. 2d [41] at 57 [(Wis. 1986)]; *State v. Flakes*, 140 Wis.2d [411] at 427 [(Wis. Ct. App. 1987)]. Therefore, [the probation officer's] cooperation with law enforcement does not change the search of [the defendant's] residence from a probation search to a police search.

Miller had reasonable suspicion for issuing the apprehension request and its issuance did not violate the Fourth Amendment.

B. <u>Act 79 and the Fourth Amendment</u>

In 2013, Wisconsin's "Act 79" "created multiple statutes relating to searches by law enforcement officers of individuals on community supervision (e.g., parole, probation, extended supervision)." <u>State v. Euell</u>, 391 Wis. 2d 649, **2 n.4 (Ct. App. 2020). The portion of Act 79 that governs law enforcement searches of individuals on felony probation states that

[i]f a person is placed on probation for a felony . . . the person, his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation. Any search conducted pursuant to this subsection shall be conducted in a reasonable manner and may not be arbitrary, capricious, or harassing. A law enforcement officer who conducts a search pursuant to this subsection shall, as soon as practicable after the search, notify the department of corrections.

Wis. Stat. §973.09(1d). "In essence, this statute lowers the legal standard required for a law enforcement officer to perform a search of a suspect if that

59

suspect is on one of Act 79's specified supervision statuses." State v. Anderson, 389 Wis.2d 106, 118 (Wis. 2019).

The Wisconsin Supreme Court has stated that courts begin consideration of the validity of an Act 79 search "by addressing the threshold inquiry of whether [law enforcement] had knowledge of [the defendant's] supervision status so as to justify an Act 79 search." Id. at 117.[6] Next, courts consider "whether under the totality of the circumstances, the police officers had reasonable suspicion that [the defendant] was committing, was about to commit, or had committed a crime." Euell, 391 Wis.2d 649, **3. See also, Anderson, 389 Wis.2d at 121. The "reasonable suspicion" standard applies because "Act 79 applies to allow a search of those on a specified supervision status 'if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition' of supervision." Anderson, 389 Wis. 2d at 121 n.10 (quoting Wis. Stat. §302.113(7r), the portion of Act 79 that governs searches of individuals on extended supervision following a felony conviction). Finally, the court must consider whether an Act 79 search was conducted in a "reasonable manner," ensuring that it was not "arbitrary, capricious, or harassing." United State v.

---

[6] In a concurring opinion, Justice Hagedorn noted that both sides had assumed that the officer's knowledge of the defendant's Act 79 status was a threshold question to the validity of an Act 79 search; he noted that the Court had no need to answer that question because the officer in Anderson knew of the defendant's probationary status, but he cautioned that if the Court ever was required to determine the issue, it should do so by analyzing the text of Act 79 and faithfully applying Fourth Amendment principles to those under Act 79 status. Anderson, 389 Wis.2d at 131-34.

*Johnson*, No. 20-cr-214, 2022 WL 102277, at *7 (E.D. Wis. Jan. 11, 2022). Act 79 does not, however, require law enforcement officers to refer to an Act 79 search as an "'Act 79 search' either prior to its execution or in subsequent communications." *United States v. Wicks*, No. 20-cr-143-JPS, 2021 WL 4786307, at *2 (E.D. Wis. Oct. 13, 2021).

The basis for statutes like Act 79 is the fact that a person on parole, probation or extended supervision has a diminished expectation of privacy under the Fourth Amendment. In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court upheld the constitutionality of the warrantless search by a law enforcement officer of a probationer whose conditions of probation required him to submit his "person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Knights*, 534 U.S. at 114. Noting that probation was a form of criminal sanction and that probationers "'do not enjoy the "absolute liberty to which every citizen is entitled,"'" *id.* at 119 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)), and considering the state's interest in encouraging probationers to successfully complete probation and its concern that a probationer "will be more likely to engage in criminal conduct than an ordinary member of the community," *id.* at 121, the Court concluded that "no more than reasonable suspicion" was necessary to justify the search, *id.* The same considerations led the Court to conclude that no warrant requirement was necessary. *Id.* The Court summed up its holding by stating that "[w]hen an

61

officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. at 121.

Five years later, the Court held that a California statute requiring parolees to agree to suspicionless searches did not violate the Fourth Amendment to the Constitution, because "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." Samson v. California, 547 U.S. 843, 850 (2006). The Court focused on the substantial state interests in reducing recidivism and promoting reintegration, and the statute's procedural safeguards that protected against "arbitrary, capricious or harassing searches." Id. at 856. The Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." Id. at 857.

More recently, the Seventh Circuit applied the reasoning in Knights and Samson to the portion of Act 79 that governs individuals on supervised release following a felony conviction. United States v. Caya, 956 F.3d 498, 503 (7th Cir. 2020). Caya had been indicted based on evidence found in his home during a search conducted under Wis. Stat. §302.113(7r). Id. at 499. He argued that the search violated the Fourth Amendment. Id. The Seventh Circuit found that Samson controlled, because "[f]ormally and practically, Wisconsin's extended-supervision system is parole by another name." Id. at 503. It reasoned that "if, as Samson holds, a no-suspicion search of a parolee is

constitutionally permissible, so too an Act 79 search—predicated on reasonable suspicion—is constitutionally permissible." Id.

The Caya court upheld the constitutionality of the provision of Act 79 that governs individuals on supervised release after being convicted of a felony—Wis. Stat. §302.113(7r). That portion states that, with regard to a felony offender released to extended supervision

> his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision. Any search conducted pursuant to this subsection shall be conducted in a reasonable manner and may not be arbitrary, capricious, or harassing. A law enforcement officer who conducts a search pursuant to this subsection shall, as soon as practicable after the search, notify the department.

Wis. Stat. §973.09(1d)—the portion of Act 79 that governs individuals on felony probation—is almost identical:

> If a person is placed on probation for a felony . . . , the person, **his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition** of probation. **Any search conducted pursuant to this subsection shall be conducted in a reasonable manner and may not be arbitrary, capricious, or harassing. A law enforcement officer who conducts a search pursuant to this subsection shall, as soon as practicable after the search, notify the department.**

Neither the Supreme Court nor the Seventh Circuit have held that probationers have *no* expectation of privacy, but the fact that a person is on probation or parole and the terms of the particular search condition, determine the *strength* of his privacy interest. United States v. Johnson, No. 20-cr-114,

63

2022 WL 102277, at *5 (E.D. Wis. Jan. 11, 2022). A person on probation in Wisconsin has "an expectation of privacy in his personal affairs subject to an officer's reasonable suspicion of an imminent or recent crime or a violation of . . . supervision," as well as "an expectation that these searches would be conducted in a 'reasonable manner' and not be 'arbitrary, capricious, or harassing.'" Id.

###### 1.    *The Search of the Defendant's Bedroom*

In his objection to Judge Dries's recommendation, the defendant describes the recommendation as discussing the "Act 79 search of [his] bedroom," and says that "Judge Dries . . . believed that the Act 79 search was based on valid reasonable suspicion and executed in a reasonable manner." Dkt. No. 37 at 6. Because the defendant "objects to all of the legal findings" described in his summary of Judge Dries's decision, including Judge Dries's conclusion about the search of the defendant's bedroom, the court must consider that search *de novo*.[7]

The defendant was on probation for a felony. He was, therefore, subject to searches under Wis. Stat. §973.09(1d). So the court begins by asking whether the officers who conducted the search of the defendant's residence on September 15, 2020 had knowledge of the defendant's supervision status. The answer is an unequivocal yes; not only did Benway know that the defendant

---

[7] As the court will discuss, the issue is not so much whether the officers had reasonable suspicion to search any particular room in the 48th Street residence, but whether they had reasonable suspicion to search the residence—period.

was on felony probation for marijuana trafficking, but he had been communicating with Jana Miller, the defendant's probation officer, and the officers went to the 48th Street address because they had an apprehension request from that probation officer.

Next, the court asks whether law enforcement had a reasonable suspicion that the defendant was committing, was about to commit or had committed any crime or violation of his supervision. Again, the answer is yes. When they went to the defendant's residence on September 15, 2020, officers knew (1) that the defendant lived at the 48th Street residence; (2) that there was a Facebook profile for a person who resembled the defendant's correctional photo and the photos and videos captured by CS, and that the profile contained photos of the person who appeared to be the defendant holding large stacks of cash (and, in one photo, leaning on the hood of a gray Audi in the driveway of the 48th Street residence); (3) that the profile contained multiple posts offering "ZaZa;" (4) that a video from May 28, 2020 showed a man in a red shirt and red shoes, whom the defendant's probation officer had identified as the defendant, come out of the residence and exchange what appeared to be marijuana for cash with someone in a car out front; (5) that a video from July 4 showed someone who appeared to be the defendant leave the residence and hand something to someone parked in a car out front; (6) that a July 10 search of the trash outside the residence had produced a digital scale cover, a broken cell phone and several plastic baggies with the corners tied; (7) that a video from July 17 showed a man matching the defendant's description come out of

65

the residence carrying a long rifle, get in a car parked out front, spend twenty minutes inside, then return to the house; (8) that on July 28 the defendant was arrested and cited in Illinois for aggravated speeding and driving with a suspended license; (9) that the list of license plate numbers and vehicle descriptions CS provided had revealed that some of the vehicles coming and going from the residence were registered to owners who had prior drug histories; and (9) that in the wee hours of the morning on August 25, Illinois police observed and attempted to pull over a gray Audi as it sped north toward Wisconsin at speeds of over 100 miles per hour; that Wisconsin police saw the same Audi enter the state and were able to identify the license plate as registered to the defendant's mother; that when police appeared at the defendant's mother's home (the 48th Street residence) an hour or so after police had seen the car, the defendant's mother explained that the defendant had left the house with the car about five hours before the speeding incident and had not yet returned; and that officers confirmed that the Audi was not in the garage.

These facts provided law enforcement with reasonable suspicion that the defendant was engaged in drug dealing, that he had possessed a gun being a convicted felon, that he had left the state without authorization and that he had committed traffic violations. Under Act 79, this reasonable suspicion authorized the officers to search the defendant, his residence and any property under his control.

In his motion to suppress, the defendant argued that by September 15, 2020, "any reasonable suspicion that may have existed had become stale." Dkt. No. 24 at 26. He asserted that there had been no reports of suspected drug activity in almost two months, that it had been almost two months since the defendant was observed with the rifle outside the residence, that no trash pulls since July 10 had revealed any contraband, and that there "was no social media activity indicating drug sales." Id. He asserted that the "incident involving the Audi and the Illinois State Police doesn't appear to have motivated the Act 79 search in any way, and for good reason," saying that "[t]here was no reason to believe police might find evidence of that violation in [the defendant's] bedroom dresser." Id.

The language of Wis. Stat. §973.09(1d) allows law enforcement to search if they have a reasonable suspicion that the probationer "has committed"—present perfect tense, referencing an event completed in the past—a crime or a probation violation. It is not clear that the Fourth Amendment concept of "staleness" applies to an Act 79 search, which allows a search any time during the supervision period if officers have reasonable suspicion that a crime or violation has been committed. But even assuming that the staleness concept applies, the information officers had was not so outdated that it provided no basis to believe evidence of the defendant's probation violations would no longer be present in the 48th Street residence.

Between the information from CS and the officers' own surveillance and activities, the officers had information indicating that there had been ongoing

67

drug activity at the defendant's residence for some two months between May 2020 and July 2020. During that time, a man matching the defendant's description had been caught on video coming out of the house with a long gun and getting into a car parked outside the house. As of August 25, 2020—three weeks before the police went to execute the apprehension request—the defendant's mother's gray Audi, on which the defendant could be seen leaning and flashing cash in one of the Facebook photos, was speeding north from Illinois to Wisconsin in the middle of the night, at a time when the defendant was not home and was known to have taken the car. It was reasonable for the officers to suspect, on September 15, 2020, that they might find evidence the defendant had violated conditions of his probation—possessing or selling controlled substances, possessing a firearm, leaving the state, committing traffic violations—even though some of the suspected violations had occurred two months prior.

In fact, the information about the August 25 incident involving the Audi was a potent source of reasonable suspicion recent enough to warrant an Act 79 search. Officers knew that one of the conditions of the defendant's probation was that he could not leave the state without his probation officer's permission. They knew that at around two in the morning on August 25, the defendant's mother's gray Audi was flying northbound through Illinois toward Wisconsin at over 100 miles per hour and that it did not stop when an Illinois officer tried to pull it over. They knew that the defendant had had the Audi hours before the Illinois officer saw it, because his mother told police that he had taken it at

68

about 9:00 p.m. the night before. They knew that the defendant's *mother* wasn't the one driving the speeding Audi, because she was at home at 3:15 a.m. when the officers went to the 48th Street residence. They knew that the defendant had not returned to the residence by 3:15 a.m. and they knew that the Audi was not in the garage at that time.

Perhaps there was an innocent explanation. But "behavior that is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." United States v. Baskin, 401 F.3d 788, 793 (7th Cir. 2005). Innocent explanations "do not discharge all other relevant facts from consideration." United States v. Richmond, 924 F.3d 404, 412 (7th Cir. 2019). The police were not required to confirm beyond a reasonable doubt that it was the defendant who was driving the car that night to conduct an Act 79 search.

The police also were entitled to consider the August 25 incident in light of everything else they knew at that point. They knew the defendant had been convicted in the past of marijuana dealing. They knew there was evidence that drug dealing had been going on in the 48th Street residence in May, June and July. They knew that in July the defendant had been captured on video in possession of a gun. They knew the defendant had posed with the Audi and a stack of cash and that the photo had been posted on the same Facebook profile that had been advertising "ZaZa." Viewed against that backdrop, the information about the defendant's mother's Audi speeding through Illinois at 2:00 a.m. on August 25 and declining to stop was even more suspicious. The

69

officers were not required to set aside their common sense. The explanation that required the fewest assumptions was that the defendant was driving the car; when they heard hoofbeats, the officers were not required to think of zebras.

Nor was it unreasonable for the officers to think they might find in the defendant's residence evidence that he had traveled to Illinois on August 24 or 25. It was reasonable to suspect that three weeks after the incident, the defendant might have had receipts for gas, food or parking, items purchased, photographs, traffic tickets received when he was driving the Audi. The defendant's skepticism that the officers had reason to believe such evidence might be found in his bedroom dresser misapprehends the analysis. Act 79, which the Seventh Circuit has deemed constitutional under the reasoning in Knights and Samson, authorizes an officer with reasonable suspicion to search the probationer, his residence and any property under his control. Presumably the dresser in the defendant's bedroom was under his control, and it was in his residence.

The defendant also argued in the motion to suppress that the "overall reasonableness—or lack thereof—of the events surrounding [the defendant's] arrest and the search of his home" was critical, dkt. no. 24 at 26, and that in his case, the officers "chose the nuclear option" and that the "result was an unreasonable search and seizure," id. at 28. He argued that the officers "seized on the apprehension request" and, obtaining the assistance of the Marshals task force, "sent about 20 law enforcement officers, most heavily armed and

70

outfitted as if they were conducting a military raid against a terrorist cell in Fallujah, to [the defendant's] home." Id. at 27. And he argued that the police could have waited until the defendant left home and conducted a traffic stop, or advised him of the apprehension request and told him to turn himself in, or sent the probation officer and a couple of officers to the house. Id. at 28.

Wis. Stat. §973.09(1d) requires officers to conduct a search "in a reasonable manner." In his motion to suppress, the defendant cited no cases interpreting the "in a reasonable manner" requirement of Act 79. Rather, he cited federal cases discussing use of force when making an arrest. Dkt. No. 24 at 27-28. In his objection, the defendant again provides no authority discussing Act 79's "in a reasonable manner" requirement, instead asserting that

> [t]he search was only made possible by police circumventing the Fourth Amendment, and using [the defendant's] probation officer as a judicial end-around to the warrant requirement. In the process, the police mischaracterized the grounds for the apprehension request and falsified the nature and substance of their correspondence with the probation officer in official reports. Then, rather than simply advising [the defendant] (who was in pretty regular contact with his probation officer) of the warrant, and arresting him, police decided to send 20 officers to his house, break down the door, search the entire home, unlawfully detain the home's occupants, lie about having a search warrant, turn off their body cameras at key points, and delete other body camera videos. And [the defendant] was not a murder suspect. Officers believed that he had sold marijuana. In sum, this search was unreasonable.

Dkt. No. 38 at 16.

Nor did the government provide the court with any authority analyzing Act 79's "in a reasonable manner" requirement. Perhaps there is none; the court could not find any. The court presumes, however, that as with Fourth

Amendment reasonableness inquiries, the question of whether officers conducted an Act 79 search in a "reasonable manner" depends on the totality of the circumstances. See, *e.g.*, Samson, 547 U.S. at 848 (quoting Knights, 534 U.S. at 118 ("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.").

The court views the totality of the circumstances differently than does the defendant. The court already has rejected the defendant's contention that the police used Miller to circumvent the Fourth Amendment. It has rejected his contention that the police mischaracterized the grounds for the apprehension request. The court has found that the search was not arbitrary or capricious, having concluded that the officers had reasonable suspicion that the defendant had committed multiple violations of his probation.

As for the number of officers who went to the 48th Street address on September 15 and how they were outfitted: officers believed that the 48th Street residence had been the site of sustained drug activity for at least two months. They had seen video of someone who looked like the defendant—a person they knew to be a convicted felon—bringing a long gun out of his house. They had reason to believe that when an Illinois officer had tried to pull him over as he was speeding toward Wisconsin, the defendant had fled that officer. They knew that the defendant was not the only person who lived in the 48th Street residence. Under these circumstances, the fact that they enlisted the Marshals task force, that some twenty officers appeared and that a number of

72

them were armed and in tactical gear, was not unreasonable. The officers were going to the residence to apprehend someone who likely had violated the terms of his probation, who might be armed, who they believed had fled police at dangerous speed and who would be surrounded by other individuals, some of whom possibly might wish to prevent his apprehension.

The defendant emphasizes the fact that the officers broke down the door. He does not mention that they first tried to get the occupants of the house to come out. They knocked and announced themselves and advised the occupants that if they didn't come out, the officers would breach the door. They heard a female voice shout that the police were there. Only after knocking for ninety seconds or so, when no one had answered the door or come out, did the officers break down the door and enter. Under those circumstances, it was not unreasonable for the officers to believe that the defendant was not going to come out of his own volition.

The defendant insists that the officers' search of the entire home was unreasonable. But Act 79 allows just that. It says that if law enforcement officers have reasonable suspicion that a person on felony probation "is committing, is about to commit, *or has committed* a crime or a violation of a condition of probation," law enforcement may search "his or her residence" at any time during the period of supervision. The defendant has insisted that the 48th Street address was his residence and that he lived there. Under Act 79, the officers were authorized to search that residence.

73

The defendant asserts that the search was unreasonable because police "unlawfully detained" the occupants of the home, because they lied about having a search warrant and because they turned off their body cameras at some point and deleted body camera footage. The argument that the officers unlawfully detained *other people* is not the defendant's to make (except in the context of consent; the court will get to that). As for his other contentions, the defendant assumes facts not in evidence. Neither party asked for an evidentiary hearing. There is no testimony from any officer who said there was a search warrant, so there is no way to know whether those officers honestly were mistaken about whether there was such a warrant or whether, as the defendant alleges, they lied. There is no evidence about why officers inside the house had no body camera recordings; the court does not know whether they forgot to activate the cameras, whether the cameras malfunctioned, whether the officers were not able to activate the cameras due to policy or logistics. There is no evidence about why some video footage was deleted or who did it. The defendant infers ill intent or malicious motive from these facts but does not explain how they demonstrate that the manner of the search, and of his apprehension, was unreasonable.

Under the totality of the circumstances, the officers conducted the search in a reasonable manner.

2.     *The Search of Flores's Bedroom*

Act 79 permits law enforcement to search the *residence* of a person on felony probation when there is reasonable suspicion that he has committed

74

violations of that probation. Despite this fact, the defendant asserts in his objection that his primary focus "remains the unlawful search of Flores's bedroom." Dkt. No. 37. In the motion to suppress, the defendant told Judge Dries that the police reports characterized the first forty minutes or so of their time in the 48th Street residence as a "protective sweep;" he argued that the protective sweep was not justified and that if it had been, it was too broad in scope. Dkt. No. 24 at 15-20. The motion also argued that Yurky's consent was invalid because it was "tainted" by his detention and because he did not have the authority to consent to the search of his adult sister's room. Id. at 20-25. In contrast, the defendant's objection focuses on what he calls "standing." Dkt. No. 37 at 7. It also asserted that Act 79 could not justify the search of Flores's room and characterized that search as "plainly unlawful." Id. at 12-13.

After the parties had briefed the motion to suppress, Judge Dries issued an order stating the following:

> Based on the record currently before me, it does not appear that the government infringed upon [the defendant's] constitutional rights when law enforcement searched his sister's bedroom and found guns, drugs, and drug-trafficking materials. First, [the defendant] has not presented any evidence to suggest that the police committed a trespass by entering a constitutionally protected area over which he (rather than his stepfather or his sister) enjoyed property rights. Second, [the defendant] has not presented any evidence to suggest that he had a legitimate expectation of privacy in the items found under the armoire and inside the laundry hamper in his sister's bedroom.

Dkt. No. 30 at 3. Because the parties had not briefed the issue and because he found there were not enough facts in the record to allow him to adequately

75

address it, Judge Dries gave the parties the opportunity to provide supplemental briefs. Id. at 4.

The question of whether the defendant had a reasonable expectation of privacy in the room occupied by his sister would have been relevant if the defendant had not been on felony probation and subject to Act 79. But the defendant *was* on felony probation and *was* subject to Act 79. The officers had reasonable suspicion to believe that he had committed violations of his probation conditions and the statute authorized them to search his "residence." The defendant consistently has maintained that that the 48th Street residence was *his* residence and that he lived there. The expectation of privacy that the defendant, a person on felony probation, had in any part of that residence was limited; it was subject to the officers' reasonable suspicion of a recent crime or a violation of the conditions of his supervision, although cabined by the expectation that any search would be conducted in a "reasonable manner" and not be "arbitrary, capricious, or harassing."

Even though the defendant was on felony probation and subject to Act 79, Judge Dries analyzed the defendant's expectation of privacy in his sister's bedroom as if the defendant had not been on probation and not subject to Act 79. He concluded that the defendant "arguably had a subjective expectation of privacy in Flores's bedroom" but noted there was no evidence that the defendant shared dominion or control over the bedroom or had the right to exclude anyone from her bedroom. Dkt. No. 34 at 27. Although he noted that the defendant was arrested in a different bedroom and that his stepfather said

that Flores and the defendant had different bedrooms, id., he found that by hiding the guns under the armoire and the drugs in the hamper, the defendant had exhibited a subjective expectation that they would remain private, id. at 28. Judge Dries found, however, that the defendant's subjective expectation of privacy in his sister's bedroom was unreasonable. Id. at 28-30.

This court need not determine whether it would have come to the same conclusion had the defendant not been on felony probation and had he not been subject to Act 79. Judge Dries reasoned in the alternative that if the defendant had a reasonable expectation of privacy in the entire house, then the entire house would be subject to search under Act 79. Id. at 30. This court sees it somewhat differently—that the expectation of privacy the defendant had in the residence was limited because he was on felony probation. Act 79 allowed officers to search the defendant's residence upon reasonable suspicion of a violation of his conditions of probation.

The defendant tries to argue that Act 79 cannot justify the search because the government never relied on Act 79 and, in fact, the officers obtained (the defendant uses the word "coerced") consent from the defendant's stepfather. Another judge in this district has rejected this argument, noting that there is no requirement in the statute that the officers identify the search as an "Act 79 search." Wicks, 2021 WL 4786307, *2. This court agrees.

Finally, although it is not necessary for the court to address the issue, to the extent the government argued in its brief that the search of Flores's bedroom is further supported by consent, the court agrees. Consent may be

77

obtained either from the defendant or from a third party who exercises common authority over the property to be searched. United States v. Matlock, 415 U.S. 164, 170–71 (1974). Common authority "rests rather on mutual use of the property by persons generally having joint access or control for most purposes." Id. at 171 n.7. Because "the ultimate touchstone of the Fourth Amendment is reasonableness," either actual authority or apparent authority is enough to support third-party consent. Illinois v. Rodriguez, 497 U.S. 177, 188–89 (1990).

The defendant argues that the officers had detained Yursky for some thirty minutes or so and asserts that even though he was not in handcuffs at the time of the consent, there was a strong police presence restricting Yursky's movements. Dkt. No. 29 at 5. It is true that because Yursky didn't come to the door when officers knocked, the officers had to bring him (and others, including the defendant) out of the house. However, the video of the officers' conversation with Yursky—captured on the Caddock Body Camera—speaks for itself. Dkt. No. 24, Ex. 3 at 23:04. Yursky freely walked into the garage. Id. at 23:04-23:14. Yursky, who was the homeowner, unequivocally consented to the search. Yursky was not in handcuffs at the time and did not appear to be coerced. He signed the consent form granting officers permission to search; the officer told him he could read it first. Id. at 23:55-24:35. Although King initially objected to the search because she had money in the house, she quickly told the officers to "go ahead" once they told her they weren't interested in her

money. Id. at 23:55-24:02. Nothing about the officers' exchanges with Yursky or King suggest coercion or duress.

## VIII.  Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 37.

Although the court does not adopt all of Judge Dries's reasoning, the court **ADOPTS** his recommendation that this court deny the defendant's motion to suppress. Dkt. No. 34.

The court **DENIES** the defendant's motion to suppress. Dkt. No. 24.

The court **ORDERS** that by the end of the day on **March 18, 2022**, the parties must file a joint status report advising the court of their next steps and indicating whether they require a scheduling hearing or a date for a change of plea.

Dated in Milwaukee, Wisconsin this 24th day of February, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**